IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff-Respondent,

v.

ALDEN BENALLY,

      Defendant-Movant.

CIV 10-0052 WJ/KBM
CR   05-1854 WJ

# PROPOSED FINDINGS
## AND
## RECOMMENDED DISPOSITION

THIS MATTER is before the Court on Alden Benally's *pro se* petition seeking habeas relief under 28 U.S.C. § 2255,[1] the documents that comprise his "amended" petition, the United States' response and motion seeking a declaration that Defendant has waived the attorney-client privilege, and the federal record. *See Docs. 1, 8-10, 14-15.*[2] Because it is possible to resolve the issues on the pleadings, and the record establishes conclusively that Petitioner is not entitled to

---

[1] Although the federal form for initiating a § 2255 action is captioned "motion," as is the common practice both in this Court and the Tenth Circuit, I refer to the document as a "petition." *See e.g., United States v. Shipp,* 589 F.3d 1084, 1086 (10th Cir. 2009) ("appeals the district court's denial of his 28 U.S.C. § 2255 habeas petition"); *United States v. Jose Garcia-Cardenas,* CIV 08-0382 LH/KBM (*Doc. 7* at 2) ("Defendant raises three claims in his § 2255 petition").

[2] Unless otherwise noted, "*Doc.*" refers to the documents filed in this civil action and "*Transcript*" refers to the transcripts of record from the criminal proceeding.

relief, I find that an evidentiary hearing is not necessary.[3]  I recommend that the United States'
motion concerning waiver be granted in part, and that the § 2255 petition be denied.

# I.  Overview

Two young girls on the Navajo Indian Reservation informed a teacher that Petitioner
sexually molested them.  During questioning by federal agents, Defendant admitted he touched
the girls on their genitals and signed a statement memorializing his admission.  Parallel federal
and state criminal proceedings ensued.  The federal proceedings charged sexual contact against
one of the girls – Whitney, the younger sister of Petitioner's common-law wife Colleen.  The
other girl – Nicole, one of Whitney's cousins – testified in the federal proceedings.  *See, e.g.,*
*United States v. Benally,* CR 05-1854 WJ (Doc. 1; Doc. 72 at 4, 7, 17).  The state prosecution
charged sexual conduct against both girls, but the state charges were dismissed after the federal
proceedings finally concluded.[4]

Roger A. Finzel was the Assistant Federal Public Defender who represented Defendant
from arraignment through direct appeal in the federal proceedings.  He intended to present the

---

[3]  *See* 28 U.S.C. § 2255(b) ("Unless the motion and the files and records of the case conclusively
show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the
United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact
and conclusions of law with respect thereto."); Rule 8(a), Rules Governing Section 2255
Proceedings For The United States District Courts ("If the motion is not dismissed, the judge
must review the answer, any transcripts and records of prior proceedings, and any materials submitted
under Rule 7 to determine whether an evidentiary hearing is warranted.").

[4]  The docket sheets for the state criminal proceedings are available online.  *See*
http://www2.nmcourts.gov/caselookup.  The two-count state criminal complaint was filed December 2,
2005 in Magistrate Court in Gallup, New Mexico.  *See State v. Benally,* M-35-FR-200500640.  After a
plea of not guilty, the case was bound over to the state District Court in Gallup and that docket sheet
specifically notes one of the minors was under age nine and the other under age thirteen.  That case
continued to be set for trial until the federal proceedings went to sentencing in July 2007.  At that point,
the state prosecutor discontinued the state prosecution.  *See State v. Benally,* D-1113-CR-200600023.

testimony of Dr. Deborah Davis as an expert witness at trial on the general subject of false confessions.  The purpose was not for her to give an opinion whether Petitioner's confession was "false," but to support the testimony Petitioner would give concerning the coercive atmosphere under which he confessed.

After a *Daubert* hearing, presiding District Judge William P. Johnson ruled Dr. Davis' testimony inadmissible.  Thereafter, the first jury was unable to reach a verdict, and the Court declared a mistrial.  A second jury found Defendant guilty.  Under the Sentencing Guideline calculations, Petitioner faced a life sentence, but Judge Johnson sentenced him to the statutory maximum imprisonment for the offense – twenty years of incarceration.  The Tenth Circuit subsequently rejected claims that Judge Johnson abused his discretion in disallowing Dr. Davis' testimony, and that he failed to use the appropriate language in finding the twenty-year sentence reasonable.  *See, e.g., United States v. Benally,* CR 05-1854 WJ (Docs. 4, 31, 131, 140); *United States v. Benally,* 541 F.3d 990, 992-94, 97 (10th Cir. 2008), *cert. denied,* 129 S. Ct. 1020 (2009).

## II.  Preliminary Matters

I granted Petitioner permission to file an amended petition.  *See Docs. 7-10.*  He did so with a document entitled "memorandum."  *See Doc. 9, 11.*  It raises seventeen separate claims of ineffective assistance of counsel and largely duplicates the claims raised in the initial petition.  *Compare Doc. 1, with Doc. 9.*  In a separate filing, he supplied the signed version of the "declaration" by his wife.  *See Doc. 9* at 47-54; *Doc. 10* at 1-5.  I consider the "memorandum" and declaration to constitute the amended petition, and use it as the operative document for discussion of Petitioner's claims below.

The United States requests that portions of the memorandum be stricken because it

exceeds local rule page limits.  *See Doc. 15* at 2-3.  Unlike most *pro se* submissions, however, the memorandum presents a detailed factual basis for the claims in a coherent, thorough, and scholarly fashion.  There is nothing to be gained by striking parts of the amended petition and further delaying the action to allow Petitioner to resubmit shorter and necessarily more vague presentation of his claims.  Judicial efficiency trumps the local rules under these circumstances. *See* D.N.M.LR-Civ. 1.7 ("These rules may be waived by a Judge to avoid injustice.").

Under *Strickland*, Petitioner must demonstrate that Mr. Finzel's conduct was constitutionally deficient and, but for that conduct, the result of the criminal proceeding would have been different.  Failure to make either showing defeats the claim, and the habeas court may resolve the claim solely on one prong, if that is the easiest course.  *E.g., Smith v. Robbins,* 528 U.S. 259, 286, n.14 (2000); *Strickland v. Washington,* 466 U.S. 668, 687, 697(1984); *United States v. Gonzalez,* 596 F.3d 1228, 1233 (10th Cir. ), *cert. denied,* 2010 WL 2345189 (2010)*; United States v. Orange,* 447 F.3d 792, 796-97 & n. 5 (10th Cir. 2006).

Review of trial counsel's conduct must be "highly deferential" because it is "all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland,* 466 U.S. at 689.  Trial counsel's conduct is not viewed from "the distorting effects of hindsight" – it is viewed from counsel's perspective at the time.  *Id.*  And, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.*  In other words, "the defendant must overcome the presumption that . . . the challenged action might be considered sound trial strategy."  *Id.* (internal quotations and citation to *Michel v. Louisiana,*

350 U.S. 91, 101 (1955) omitted).

For the prejudice prong, Petitioner "must show that there is a reasonable probability" the result would have been different. *Id.* at 694. In making that assessment, this Court "must consider the totality of the evidence before the judge or jury." *Id.* at 695.

As related to an evidentiary hearing, Petitioner asserts that this Court "must accept [his] factual assertions as true, unless they are patently incredible or have been disputed by affidavit," but also that "disputed facts which are material to the determination of a petitioner's claims cannot be decided by affidavits," and instead "must be decided following an evidentiary hearing where the parties are subjected to examination while under oath." *Doc. 9* at 2 (citing *Fontaine v. United States,* 411 U.S. 213 (1973), and *Harris v. United States,* 436 F.2d 591, 594 (10th Cir. 1971)). I will overlook the fact that neither the amended petition nor the declarations by Petitioner and his wife fully comply with the necessary language to give their assertions the effect of an affidavit.[5]

Also, the United States asks for the Court to declare a waiver based on the Tenth Circuit decision in *United States v. Pinson*, 584 F.3d 972 (10th Cir. 2009), *cert. denied,* 130 S. Ct. 1548

---

[5] Habeas Rule 2 requires, among other things, that a 2255 petition "must . . . be signed under penalty of perjury by the movant." *See* Rule 2(b)(5), RULES GOVERNING SECTION 2255 PROCEEDINGS FOR THE UNITED STATES DISTRICT COURTS. Court forms for 2255 petitions, like the one Petitioner used for his initial petition, contain the requisite language. *See Doc. 1* at 13. The memorandum does not. The only portion of it that is "certified under penalty of perjury" is the certificate of mailing. *Doc. 9* at 42. Similarly, under § 1746, for unsworn declarations, they must indicate that the statements are "true under penalty of perjury," by using something substantially similar to this language – "I declare . . . under penalty of perjury . . . the foregoing is true and correct." 28 U.S.C. § 1746(2) (for statements executed in the United States). Petitioner's own "declaration" that he attached to the petition does not use the word "perjury." It simply begins and concludes with a statement that it is "made pursuant to the penalty provisions of 28 U.S.C. § 1746" and concludes that the "above statements are true and correct to the best of my information, knowledge and belief." *Doc. 9* at 43, 46. His wife's declaration is the same, except hers specifically opens with the acknowledgment that her statements are made under "penalty of perjury." *Doc. 10* at 1. Neither declaration completely tracks the language suggested by the statute. Nevertheless, the initial petition did utilize the federal form and the two declarations try to comply with the statute.

(2010).  *See Doc. 14* at 3.  *Pinson* holds that "when a habeas petitioner claims ineffective

assistance of counsel, he impliedly waives attorney-client privilege with respect to

communications with his attorney necessary to prove or disprove his claim."  *Id.* at 978.  The

scope of a court-imposed waiver "must [be] no broader than needed to ensure the fairness of the

proceedings before it [and] carefully tailored to protect prisoners' Sixth Amendment rights."  *Id.*

at 978-79 (internal quotations and citations to *Bittaker v. Woodford,* 331 F.3d 715, 720 (9th Cir.),

*cert. denied,* 540 U.S. 1013 (2003), omitted).  Mr. Finzel interprets the *Pinson* waiver narrowly.

*See Doc. 15-1* at 2, 3.  Although he has "requested . . . that this Court . . . permit[] [him] to offer

any evidence or relevant information . . . to refute the claims," his affidavit is accordingly

"limited."  *Id.* at 2.  In direct contradiction to some of Petitioner's assertions, the substantive

portions of Mr. Finzel's affidavit state the following:

> 3.  . . .  I discussed with the Petitioner his right to a speedy trial pursuant to the
> Speedy Trial Act and the Sixth Amendment.  Based on our discussions, I believed
> that he understood his speedy trial rights.  I explained to him the reasons for each and
> every continuance.  Each continuance motion fully explained the reasons for each
> request.  On two occasions a hearing on the motion to continue was held before the
> Court. . . .
> 4.  . . .  I advised the Petitioner of the opportunity to plea and the requirements
> associated with a plea agreement.  I specifically explained to the Petitioner that he
> could not enter a plea of guilty unless he was willing to admit to the alleged offense.
> I also advised the Petitioner about the opportunity to proceed to a trial on the merits.
> Additionally, I dd not tell the Petitioner . . . "that the jury would not convict" [him].
> Further, I do not recall telling the Petitioner that a sentence of a guilty plea and a
> sentence for a conviction after trial "would be about the same."
> 5. . . .  I properly advised him of his rights and the potential risks associated with
> testifying at trial on his own behalf and I believed he understood those rights and
> risks.

*Doc. 15-1* at 2-3.

Petitioner did not respond to this motion, nor did I permit him to file a "reply," if that is

where he intended to comment on the waiver issue.  *See Docs. 16, 17.*  I find it unnecessary to

resolve the breadth of the waiver, or to hold an evidentiary hearing on the factual issues posed by the contradictory assertions of Petitioner and Mr. Finzel.  For the reasons below, none of Petitioner's claims warrant habeas relief.

# III.  Analysis Of Claims

The claims are arranged topically and the material facts for each claim are discussed in their respective sections.

## A.  Speedy Trial

The August 23, 2005 indictment charged Petitioner with sexual contact of "Jane Doe" in violation of 18 U.S.C. §§ 1153 (crimes committed within Indian country), 2244(a)-(c) (abusive sexual contact), 2246(3) (definition of "sexual contact).  Petitioner was not arraigned until mid-October because the first summons was returned without success, and then Petitioner failed to appear at the first arraignment setting.  Petitioner entered his not guilty plea on October 18, 2005 and was released to La Posada Halfway House as third-party custodian, with conditions.  *See United States v. Benally,* CR 05-1854 WJ (Docs. 1-6).

On November 4, 2005, the United States filed its first motion in limine, seeking permission to introduce Petitioner's other acts of sexual conduct with Nicole at Whitney's trial.  Consistent with Petitioner's confession, the indictment only charged him with several instances of sexual contact with Whitney over the course of about two years.  She, however, was expected to testify to many more instances over a period of four or five years.  Nicole was also expected to testify about Petitioner's sexual contact with her.  The United States therefore asked Judge Johnson to allow it to introduce evidence of these other acts of sexual abuse at trial.

After the United States received informal notification that the defense would call Dr.

Davis, it filed a second motion in limine on April 11, 2006, seeking a pretrial *Daubert* hearing concerning her testimony. *See id.* (Docs. 8, 28, 31).  Both motions remained pending until just before the first trial.  Following a hearing, the Court ruled on September 1, 2006 that her testimony was not admissible.[6]

In the interim, the defense moved to continue trial settings five times for various reasons. Each time, the defense motion recited that Petitioner "understands the need for this continuance," did not object to the requested continuance, "waives his speedy trial rights pursuant to 18 U.S.C. § 3161(h)(8)(A)," and that the "ends of justice will be served by the requested continuance and this outweighs the interest of the public and the defendant in a speedy trial pursuant to 18 U.S.C. § 3161(h)(8)(A)." *Id.* (Doc. 10 at 1-2; Doc. 22 at 1-2; Doc. 25 at 2; Doc. 32 at 2; Doc. 36 at 2).  The United States did not oppose any of these defense motions to continue save for one – the defense request to continue trial based on Dr. Davis' then-undetermined availability for a pretrial *Daubert* hearing. *See id.* (Doc. 32 at 2).  Each time, the Court granted the continuance specifically stating:  "Pursuant to 18 U.S.C. § 3161(h)(8)(A), this court finds that the ends of justice served by granting this continuance outweigh the interest of the defendant and the public in a speedy trial."[7] *Id.* (Docs. 11, 23, 26, 34, 37).

The first trial commenced September 11, 2006, and the court declared a mistrial on September 18, 2006. *See id.* (Docs. 57, 70).  On October 26, 2006, Petitioner was granted permission to reside in Arizona with his wife and baby daughter. *See id.* (Docs. 73, 77).  The

---

[6] *See id.* (Doc. 38 – notice of *Daubert* hearing, Doc. 39 – defense response to *Daubert* motion in limine, Doc. 47 – United States' motion for pretrial hearing on first motion in limine, Doc. 52 – order setting hearing on first motion in limine, Doc. 56 – defense response to first motion in limine, Doc. 58 – clerk's minutes from hearing).

[7] Due to amendments effective October 13, 2008, the Speedy Trial Act was amended such that 18 U.S.C. § 3161(h)(8) is now codified at 18 U.S.C. § 3161(h)(7).

next day, the United States and the defense filed a detailed joint motion to continue the second

trial in light of the upcoming state criminal trial and need to review the federal transcripts and

proceedings.  They "agree[d] that there is no speedy trial issue in this case at this time," that "a

new clock runs from the date of the mistrial," and noted that Petitioner also "waives any speedy

trial rights or claims that he may have."  *Id.* (Doc. 78 at 2).  Judge Johnson granted the motion

making the ends of justice findings expressly referring to "the reasons set out in the joint motion

of the parties."  *Id.* (Doc. 79).

Thereafter, the defense requested another continuance of trial, noting a recent illness,

other settings, the need for additional investigation and preparation, and counsel's "plans to file a

motion to suppress the defendant's statement based on the information that came forth in the

course of the trial."  *Id.* (Doc. 81 at 2); *see also id.* (Doc. 81 at 1-3).  Judge Johnson granted this

continuance over the objection of the United States stating he expressed no view on the merits of

the new defense strategies, but did find "that a failure to grant a continuance would unreasonably

deny counsel for the defendant reasonable time necessary for effective preparation taking into

account the exercise of due diligence," and thus concluded that "the ends of justice will be

served by granting the continuance pursuant to 18 U.S.C. § 3161(h)(8)(A) and (B)(iv)."  *Id.*

(Doc. 85 at 2); *see also id.* (Doc. 81 at 3; Docs. 82-86).  Another partial extension of the trial

date followed at the request of defendant, which again recited Petitioner's understanding and

waiver, and service of the ends of justice.  Jury selection and pretrial motions began on February

5, 2007, and trial began on February 12, 2007.  *See, e.g., id.* (Docs. 88-91, 101, 112).

Petitioner claims that Mr. Finzel was ineffective because he failed to move to dismiss

based on violations of the constitutional and statutory rights to a speedy trial.  *See Doc. 9* at 3-15.

Neither claim affords habeas relief.

### 1.  Sixth Amendment Guarantee To A Speedy Trial

Petitioner asserts that all of the *Barker* factors weigh "heavily" in his favor and, therefore, Mr. Finzel was ineffective in failing to move to dismiss the case on the basis of a Sixth Amendment speedy trial violation.  Petitioner challenges the delay between indictment and the first trial, but in one instance makes arguments concerning the delay between indictment and the second trial.  *See Doc. 9* at 12-15.

***Barker Balancing Test Will Be Applied.***  The Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. CONST. amend. VI.  The right is "fundamental" and unique because it protects societal interests in addition to the interests of the accused.  As such, the primary responsibility for securing the right lies with the Court and the prosecutor, not the defendant.  Accordingly, though relevant for the analysis, a defendant's failure to demand a speedy trial does not completely foreclose a Sixth Amendment speedy trial claim.  *E.g., Barker v. Wingo,* 407 U.S. 514, 519-21, 527-30 (1972).  The *Barker* test for determining whether a speedy trial violation of constitutional magnitude has occurred is a balancing test that has been described as "amorphous, slippery, and necessarily relative."  *Vermont v. Brillon,* 129 S. Ct. 1283, 1290 (2009).  There are no bright-line rules for when the test applies, how the factors apply, or the circumstances under which a violation occurs.  *E.g., Brillon,* 129 S. Ct. at 1290; *Barker,* 407 at 522, 530.

The first inquiry determines whether the balancing test will be applied at all.  This depends on whether the delay has reached a "presumptively prejudicial" threshold.  The triggering event is arrest or indictment, whichever comes first.  *E.g., United States v. Seltzer,* 595 F.3d 1170, 1176 (10th Cir.  2010).  Here, the indictment is file-stamped August 23, 2005, and the

United States' indicates that is the same day the indictment was returned. *See United States v. Benally,* CR 05-1854 WJ (Docs. 1, 4-6); *Doc. 15* at 1 ("On August 23, 2005, a Federal Grand Jury indicted the Petitioner").  Though not reflected on the federal docket, in the indictment, or in court minutes, the United States also notes that "the indictment remained sealed until the arraignment . . . on October 18, 2005." *Doc. 15* at 8.  Apparently, this is why Petitioner characterizes the indictment as not having been "returned" until the date he was arraigned. *Doc. 9* at 12 ("In this matter the indictment was returned on October 18, 2005.").  Thus, both the United States and Petitioner use the October 18, 2005 arraignment date as the date the speedy trial right attached.  However, none of us arrive at the same calculation for the number of days that elapsed between then and September 11, 2006, the initial day of the first trial.[8]

Regardless of these contradictory calculations and regardless of whether the August 23rd or October 18th dates are used as the starting date, in light of unclear law,[9] I conclude that even

_____

[8]  Petitioner concluded the interval was "364 days," *Doc. 9* at 13, the United States concluded it was "345 days," *Doc. 15* at 8, and my personal and Internet date calculators both conclude the interval was "328 days."

[9]  In the context of indictments, it is unclear whether the return, the file-stamped date, or the unsealing of a sealed indictment is the operative "attachment" date.  In most cases, the date of return and date of public filing the indictment are presumably the same.  Nevertheless, cases use both the term "return" and "filing" to pinpoint the date when the speedy trial right attaches concerning an indictment.  I have not found a decision that indicates which date would control if they were different. *Compare e.g., United States v. Hills,* 2010 WL 3239394 at *7 (7th Cir. 2010) ("The constitutional right to a speedy trial is triggered when an indictment is returned against a defendant."), *with Jackson v. Ray,* 390 F.3d 1254, 1261 (10th Cir. 2004) ("the state filed its information, the functional equivalent of an indictment, four and one-third years before bringing Mr. Jackson to trial"), *cert. denied,* 546 U.S. 834 (2005).

As for sealed indictments, as the United States observes, it is true that the Supreme Court's 1971 decision in *Marion* mentions the "public" nature of the accusation" as key. *See Doc. 15* at 8.  But *Marion* is not applicable here because it did not involve a sealed indictment.  There, the government delayed issuing an indictment (and hence an arrest) for years after learning of the crimes.  Once the indictment issued, the criminal proceedings proceeded quickly.  The fairness of pre-indictment delay was at issue, and the Court refused to extend the Sixth Amendment right to speedy trial prior to arrest.  It discussed that statutes of limitations and the Fifth Amendment due process clause provided protection against abuse in those situations. *E.g., United States v. Marion,* 404 U.S. 307, 321, 322, 324 (1971). The Court's later decision in *MacDonald* emphasizes that the charge is "pending" as key. *United States v. MacDonald,* 456

the shortest interval here is sufficient to trigger the *Barker* inquiry.[10]  It is fair to say that the

September 2006 trial proceedings commenced right around the one-year mark for either of the

triggering alternatives.  In other words, the first trial either started within about nine months of

---

U.S. 1, 7 (1982) ("Although delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment . . . or to a claim under any applicable statutes of limitations, no Sixth Amendment right to a speedy trial arises until charges are pending.") (citation to *United States v. Lovasco,* 431 U.S. 783, 788-89 (1977) omitted).

      Also, in the Court's 1992 *Doggett* decision, at issue was the almost decade delay between the indictment and the arrest.  In their dissent, Justices Thomas and Scalia mentioned that "the lower courts consistently have held that, with respect to sealed (and hence secret) indictments, the protections of the Speedy Trial Clause are triggered not when the indictment is filed, but when it is unsealed."  505 U.S. at 664.  In support, they cited the leading case by the Second Circuit in *Watson.  Id.* (citing *United States v. Watson,* 599 F.2d 1149, 1156-57 & n.5 (2nd Cir. 1979), *modified on other grounds sub nom. United States v. Muse,* 633 F.2d 1041 (2nd Cir. 1980) (en banc), *cert. denied,* 450 U.S. 984 (1981)).  They also cited footnotes in two other cases, one from the Tenth Circuit and one from the Eighth Circuit.  *See id.* (citing *United States v. Hay,* 527 F.2d 990, 994 & n.4 (10th Cir. 1975), *cert. denied,* 425 U.S. 935 (1976), and as analogous support *United States v. Lewis,* 907 F.2d 773, 774, n.3 (8th Cir.), *cert. denied,* 498 U.S. 906 (1990)).  The *Watson* decision has been disavowed in more recent cases.  *E.g., United States v. Leaver,* 358 F. Supp. 2d 255, 268 (S.D.N.Y. 2004) ("I therefore conclude that *Watson* is no longer controlling authority, and that the Sixth Amendment speedy trial guarantee attaches when an indictment is filed, regardless of whether it is sealed."); *see also United States v. Williams,* 231 Fed. App'x 457, 462-63 & n.6 (6th Cir. 2007) (using return/filing of sealed indictment as attachment date and noting that "the First, Fifth, and Eleventh Circuits have all rejected a bright-line rule and instead, in accordance with the Supreme Court's multi-factor balancing approach in *Barker,* have held that delay while an indictment is sealed may be considered.") (citing *United States v. Casas,* 356 F.3d 104, 112-13 (1st Cir. 2004), *order clarified on other grounds by United States v. Cunningham,* 359 F.3d 627 (1st Cir.), *cert. denied sub nom.,* 541 U.S. 1069 (2004); *United States v. Bergfeld,* 280 F.3d 486, 489 (5th Cir. 2002); and *United States v. Hayes,* 40 F.3d 362, 365 (11th Cir. 1994), *rehearing denied,* 49 F.3d 734 (11th Cir.), cert. denied, 516 U.S. 812 (1995)).  The *Hay* decision has likewise been questioned.  *E.g., Leaver,* 358 F. Supp. 2d at 268, n.106.

    [10]  Even though both Petitioner and the United States use the first trial as the benchmark for the length of delay, it appears that most courts hold when there is a mistrial, the interval for *Barker* analytical purposes runs from arrest or indictment at least through the beginning of the last trial.  *E.g., United States v. Hughes,* 602 F.3d 669, 672 (5th Cir. 2010), *petition for cert. filed 6/6/10; United States v. Hall,* 551 F.3d 257, 271 (4th Cir. 2009).  The Tenth Circuit appears to be among them.  *Compare United States v. Batie,* 433 F.3d 1287, 1290 (10th Cir.), *cert. denied,* 548 U.S. 908 (2006), *rehearing denied,* 548 U.S. 934 (2006), *with United States v. Rich,* 589 F.2d 1025, 1026, 1033 (10th Cir. 1978).  Courts in the Ninth Circuit appear to be the only ones that hold the Sixth Amendment speedy trial clock begins to run anew after a mistrial.  *E.g., Gray v. Haws,* 2010 WL 3210861 at *5 (E.D. Cal. 2010) ("petitioners retrial commenced approximately one year after the conclusion of his first trial.  *See Blackburn v. United States,* 564 F.2d 332, 334 (9th Cir. 1977) (when a case is set for retrial following a mistrial, the defendant's speedy trial right begins to run again from the date of the mistrial"); *Hudson v. California Dept. of Corrections,* 2008 WL 2677050 at *12 (C.D. Cal. 2008).

arraignment and about fourteen months after the indictment was filed. The one-year mark is typically found sufficient to trigger the *Barker* inquiry. *E.g., Doggett v. United States,* 505 U.S. 647, 652 n.1 (1992); *Seltzer,* 595 F.3d at 1176. Because there are no bright-line rules, cases involving intervals from nine to thirteen months are the most difficult to predict whether a *Barker* inquiry will be deemed warranted.[11] So, in an abundance of caution, I will proceed with the analysis.

  ***Length Factor Is Neutral.*** The first *Barker* factor – length of the delay – weighs in favor of the prosecution if the first trial is the benchmark because it just barely "stretche[d] beyond the bare minimum to trigger judicial examination of the claim." *Doggett,* 505 U.S. at 652. Even using the second trial as the benchmark, the overall delay was nowhere near the "extraordinary" delays that would tip the balance in favor of the defense. *E.g., id.* (the greater the delay, the more likely it is to weigh in the defendant's favor); *id.* at 657-58 (six-year delay extraordinary); *Barker,* 507 U.S. at 533 ("well over five years" extraordinary). At best for the defense, this factor is neutral.

  ***Reasons For Delay Weighs Heavily Against Petitioner.*** The second *Barker* factor weighs heavily against defendant because legitimate defense preparation and scheduling needs were the basis for each of the five requests for delay of the first trial. Likewise, after both parties sought a delay to deal with the aftermath of the mistrial, the defense was solely responsible for seeking the other two short delays in order to properly prepare for trial. "'[I]f delay is

---

  [11] *Compare United States v. Bucio,* 2010 WL 1857381 at * 4 (10th Cir. 2010) (one year and one month sufficient), *with United States v. Rich,* 589 F.2d 1025, 1033 (10th Cir. 1978) (noting courts had held that delays of ten to eighteen months were not prejudicial; declining to decide whether delay of "somewhat more than nine months" for retrial after first jury unable to reach a verdict was "presumptively prejudicial" because defendant "clearly has not made a strong showing on the other three factors"), *and Harvey v. Shillinger,* 76 F.3d 1528, 1533 (10th Cir.) (listing Tenth Circuit cases finding delays of up to eight months not presumptively prejudicial), *cert. denied,* 519 U.S. 901 (1996).

attributable to the defendant, then his waiver may be given effect under standard waiver doctrine.' . . .  That rule accords with the reality that defendants may have incentives to employ delay as a 'defense tactic':  delay may 'work to the accused's advantage' because 'witnesses may become unavailable or their memories may fade' over time." *Brillon,* 129 S. Ct. at 1290-91 (quoting *Barker,* 407 U.S. at 529 and 521, respectively).

It does not matter that defense counsel, rather than Petitioner himself, asked for the delay. "Because 'the attorney is the [defendant's] agent when acting, or failing to act, in furtherance of the litigation," delay caused by the defendant's counsel is also charged against the defendant. . . . The same principle applies whether counsel is privately retained or publicly assigned." *Id.* (quoting *Coleman v. Thompson,* 501 U.S. 722, 753 (1991)).

**Petitioner Fails To Make Requisite Showing For Prejudice.**  Skipping to the fourth factor – prejudice to the defendant – Petitioner's assertion that "a specific showing of prejudice is not required" is utterly wrong. *Doc. 9* at 14.  The length of the delay here is nowhere near long enough for prejudice to be presumed. *E.g., Doggett,* 505 U.S. at 658 (six years); *Seltzer,* 595 F.3d at 1180 n.3 ("Generally, the court requires a delay of six years before allowing the delay itself to constitute prejudice.").  As such, Petitioner bears the burden of showing specific instances of actual prejudice. *E.g., United States v. Loud Hawk,* 474 U.S. 302, 315 (1986) ("possibility of prejudice is not sufficient"); *Jackson v. Ray,* 390 F.3d 1254, 1264 (10th Cir. 2004) ("The burden of showing all types of prejudice lies with the individual claiming the violation").

The most important two of the three interests protected by this factor are not raised by Petitioner, or implicated on the facts. *E.g., Seltzer,* 595 F.3d at 1179-81 (minimizing impairment to the defense by defense witnesses becoming unavailable or unable to recall matters, and

oppressive pretrial incarceration); *United States v. Gomez,* 67 F.3d 1515, 1523-24 (10th Cir.

1995) ("First, as we stated in [*United States v. Tranakos,* 911 F.2d 1422, 1429 (10th Cir. 1990)]

"[p]rejudice occurs only when 'defense witnesses are unable to recall accurately the events of

the distant past.'"). The sole ground Petitioner cites is the anxiety he experienced:

> Petitioner clearly suffered a lengthy period of anxiety and concern. For just one day shy of one year (sic) an allegation of the most reprehensible of acts hung like a black cloud over Petitioner. Having to carry the psychological weight associated with the stigma of being an alleged child-molester weighs heavily in favor of Petitioner in a review under *Barker.*
>
> And while Petitioner was not jailed pre-trial, he was required to live in a half-way house, hundreds of miles from his wife and child. He was stigmatized by his fellow prisoners, the staff at the halfway house, and was at every conceivable opportunity threatened with incarceration. [Exhibit 1]. The psychological pressures placed on Petitioner during this lengthy period of pretrial uncertainty eventually led to Petitioner's return to the use of alcohol which then led to his pretrial release being revoked. (R. 107).
>
> As the *Barker* Court wrote [concerning disadvantages to the accused by long pretrial incarceration, including loss of job, disruption of family life, enforced idleness, little or no access to recreational or rehabilitative programs, and hindering ability to prepare defense].
>
> While not in a physical prison, Petitioner was indeed a prisoner by virtue of his assignment to a halfway house, by virtue of being separated from his family for more than a year, (R. 69), and by virtue of having to live under the Sword of Damocles for more than one year.

*Doc. 9* at 14-15. Petitioner glosses over the fact that within a few weeks of the mistrial, he was

permitted to leave New Mexico to live with his wife and infant daughter in Arizona, and he

remained there until a few weeks before the second trial.[12]

In any event, the anxiety he alleges is not "unusual," "substantial," distinguishable from

"similarly-situated" defendants, or attributable to an excessive length of delay. *See United States*

---

[12]   Benally neglects to mention the reason the federal court discovered he violated the "no alcohol" condition for his release on bond – the Phoenix police arrested Petitioner on an outstanding warrant for failure to pay fines, and he appeared "highly intoxicated" at the time of his arrest. *United States v. Benally,* CR 05-1854 WJ (Doc 107); *see also id.* (Docs. 69, 73, 76, 77, 107).

*v. Yehling,* 456 F.3d 1236, 1245 (10ᵗʰ Cir. 2006) ("To establish prejudice as a result of anxiety, a defendant must make a particularized and substantial showing of anxiety distinguishable from anxiety suffered by other similarly situated defendants."); *see also United States v. Batie,* 433 F.3d 1287, 1292 (10ᵗʰ Cir. 2006); *Champion v. Harris,* 15 F.3d 1538, 1565 (10ᵗʰ Cir. 1994). Furthermore, being under a "cloud of suspicion" is assigned minimal prejudicial impact where, as here, Petitioner does not "allege the delay impaired the defense." *Yehling,* 456 F.3d at 1245 (citing *Barker,* 407 U.S. at 534). Petitioner fails to sustain his burden of proof on this factor.

   ***Assertion Factor Weighs Heavily Against Petitioner.*** The third *Barker* factor – assertion of the right to a speedy trial – also weighs heavily against Petitioner. He "[a]dmit[s] the record of this case does not reflect Petitioner's assertion of his right to a speedy trial," *Doc. 9* at 13, but he lays the blame solely on Mr. Finzel. Benally contends that counsel explained he was seeking a continuance but "never explained to Petitioner his right to a speedy trial." *Id.* Mr. Finzel's affidavit asserts otherwise. *See Doc. 15-1.* I need not make a factual determination about what they did or did not discuss to decide this factor, however.

   This *Barker* factor is "closely related" to all of the other factors. *Barker,* 407 U.S. at 531. If a defendant actively asserts his right to a speedy trial, it is considered an "important" factor that is entitled to "strong evidentiary weight." *Id.* at 531-32. But if, as here, a defendant does not assert the right, it is "difficult" to establish a claim. *Id.* at 532; *see also e.g., Doggett,* 505 U.S. 653. If a defendant truly wants to go to trial sooner rather than later, "the more likely a defendant is to complain." *Barker,* 407 U.S. at 531. Thus, when a defendant is represented by counsel, "a defendant can show that he asserted his right to a speedy trial," by identifying "'a motion or some evidence of direct instruction to counsel to assert the right at a time when formal assertion would have some chances of success.'" *United States v. Battis,* 589 F.3d 673, 681 (3ʳᵈ

Cir. 2009) (quoting *Hakeem v. Beyer,* 990 F.2d 750, 766 (3ʳᵈ Cir. 1993)).

Requiring this sort of showing is consistent with the *Batie* decision where the Tenth Circuit reversed the district court's dismissal of an indictment on speedy trial grounds.  *United States v. Batie,* 433 F.3d 1287, 1290 (10ᵗʰ Cir.), *cert. denied,* 548 U.S. 908 (2006), *rehearing denied,* 548 U.S. 934 (2006).  The district court docket sheet in that case shows that Mr. Batie was represented by counsel throughout the proceedings.  *See United States v. Batie,* CR 03-0351 TS (docket sheet available though CM/ECF, Doc. 3 – appointing counsel, same attorney who represented Batie on appeal); *Batie,* 433 F.3d at 1289.  The Tenth Circuit's decision thus attributes counsel's responses and actions concerning continuances as attributable to the defendant.  It held:

> Perhaps most important is whether the defendant has actively asserted his right to a speedy trial.  This is not satisfied merely by moving to dismiss after the delay has already occurred.  Such a motion could be, indeed may well be, strategic.  The question, instead, is whether the defendant's behavior during the course of litigation evinces a desire to go to trial with dispatch. . . .  Mr. Batie had moved for and received two continuances, one of which was jointly sought, before his first motion to dismiss on speedy trial grounds.  Even after moving (for the first time) to dismiss the indictment for a violation of his right to a speedy trial, Mr. Batie moved a third time to continue the trial.  This motion was granted over the government's objection.  Mr. Batie's persistent requests for continuances, even when opposed, scarcely demonstrate a desire for a speedier process.  Thus, this factor weighs against Mr. Batie.

*Batie,* 433 F.3d at 1291-92.  Like *Batie,* this case lacks any evidence that Petitioner wanted a speedy trial.[13]  Indeed, in the Tenth Circuit, with no countervailing factors weighing in his favor,

---

[13]  *Compare Belton v. Jones,* 2009 WL 3125714 at * 10 (W.D. Okla. 2009) (defendant who was represented by counsel at trial established assertion of right by pro se motion seeking a speedy trial and opposition to further continuances), appeal dismissed, 364 Fed. App'x 466 (10ᵗʰ Cir. 2010); *c.f., United States v. Klingensmith,* 336 Fed. App'x 828, 832 (10ᵗʰ Cir. 2009) (speedy trial act claim where "the record contains no evidence that [Mr. Klingensmith] objected to his counsel's requests for continuances or asserted his speedy trial rights in any manner. . . . Mr. Klingensmith has thus failed to show that his counsel was constitutionally ineffective.").

the fact the defense asked for virtually all of the extensions is essentially conclusive of the constitutional claim. *See United States v. Bucio,* 377 Fed.Appx. 782, (speedy trial claim found "frivolous" where "[Defendant] is the one who sought and obtained virtually all the continuances." Accordingly, I find that this factor weighs heavily against Petitioner.

**No Sixth Amendment Violation.** On balance, none of the factors weigh in favor of Petitioner, much less heavily in his favor, and his failure to assert his speedy trial rights alone is determinative. Thus, Petitioner utterly fails to establish a Sixth Amendment speedy trial violation.

## 2. Speedy Trial Act

Petitioner's Speedy Trial Act claim challenges only the interval between arraignment and his first trial. *See Doc. 9* at 3-7. The Speedy Trial Act requires trial begin within seventy days of arraignment. *See* 18 U.S.C. § 3161(c)(1). Thus, had the clock run uninterrupted from the October 18, 2005 arraignment date, the seventy-day period would have expired on December 27, 2005. The original jury selection and trial setting was December 6, 2005 – forty-nine days into the seventy-day period, with twenty-one days left to spare. *See United States v. Benally,* CR 05-1854 WJ (Doc. 9). Just because the actual first day of trial on September 11, 2006 fell well outside that period does not establish a violation of the Act, however. Certain periods are excluded from the speedy trial act calculation including pending motions and continuances granted because the judge finds that the ends of justice outweigh the best interests of the public and defendant in a speedy trial.[14]

_____

[14] As noted earlier, certain provisions of the Speedy Trial Act were recodified in 2008. Thus, the section excluding "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" moved from 18 U.S.C. § 3161(h)(1)(F) to 18 U.S.C. § 3161(h)(1)(D).

Petitioner asserts that Mr. Finzel was ineffective for failing to move for dismissal under the Speedy Trial Act for two reasons:  (1) Judge Johnson's "ends of justice" findings in granting the defense continuances did not satisfy *Zedner v. United States,* 547 U.S. 489 (2006) or *United States v. Williams,* 511 F.3d 1044 (10th Cir. 2007), and (2) under American Bar Association guidelines, if Mr. Finzel could not adequately represent Petitioner due to his workload, then he was under a conflict of interest that required him to reassign the matter rather than seek continuance after continuance.  *Doc. 9* at 7-11.  I will defer discussion of Petitioner's second ground until the next section.

Petitioner's Speedy Trial Act claim affords no basis for relief for several independent reasons.  Foremost, Petitioner does not mention the effect of motions filed by the United States. In general, motions filed by the United States can contribute to excludable delay, and the period runs from when the motions are filed through disposition.[15]  The United States' first motion was more than a simple and routine discovery request – it sought a hearing on whether it could introduce similar acts evidence at trial.  Thus, this motion stopped the clock from shortly after arraignment until shortly before trial.  *See United States v. Smith,* 569 F.3d 1209, 1212-13 (10th Cir. 2009), *cert. denied,* 130 S. Ct. 1092 (2010); *Williams,* 511 F.3d at 1053-54.

It should be noted that although the motion did not ripen for months, the long delay in ruling was not due to oversight.  Rather, the defense attributed its delay in responding to the

---

[15]  *See, e.g., Henderson v. United States,* 476 U.S. 321, 323-24, 330-31 (1986) (excluded "from the Speedy Trial Act's 70-day limitation [is] all time between the filing of a motion and the conclusion of the hearing on that motion, whether or not a delay in holding that hearing is 'reasonably necessary,'" as well as "time after a hearing has been held where a district court awaits additional filings from the parties that are needed for proper disposition of the motion."); *United States v. Hutchinson,* 573 F.3d 1011, 1029 (10th Cir. 2009); *United States v. Oberoi,* 295 F. Supp. 2d 286, 303 n.29 (W.D.N.Y. 2003) ("The Speedy Trial Act exclusion under § 3161(h)(1)(F) applies to motions filed by the government as well as motions filed by the defendant.").

motion to the state and federal prosecutors decision to not allow a deposition of Whitney.   The motion was filed on November 4, 2005 and remained pending until at least September 1, 2006,[16] thereby encompassing 301 days during which time the deadline was tolled.  Thus, between arraignment on October 18, 2005 until jury selection on September 11, 2006, only 27 days of the 70-day period actually ran.[17]

Second, even if the United States' first motion somehow could be characterized as routine and simple and thereby excluded no more than thirty days, *see e.g., Henderson v. United States,* 476 U.S. 321, 329 (1986), the first in a series of defense motions requesting continuances of the trial settings was filed during that thirty-day period – November 17, 2005.  Each motion

---

[16]  Because not all of the proceedings from the first trial were fully transcribed and the Clerk's minutes are not so detailed, it is not clear whether the motion was ruled on at the September 1, 2006 hearing or on September 5, 2006.  *See United States v. Benally,* CR 05-1854 WJ (Docs. 8, 56, 58).

[17]  The courts are divided whether trial "commencement" for Speedy Trial Act occurs when jury voir dire proceedings begin or when the jury is empaneled.  *E.g., United States v. Gonzales,* 671 F.2d 441, 443-44 (11th Cir. 1982) ("Strangely, neither the Speedy Trial Act nor its legislative history defines when a trial "commences. . . .  We do not think that the Congress envisioned dismissal of an indictment when the court begins the voir dire within the Act's required limit, but does not actually swear the jury within that time. . . .  We caution that our decision not be viewed as a license to evade the Act's spirit by commencing voir dire within the prescribed time limits and then taking a prolonged recess before the jury is sworn and testimony is begun."), *cert. denied,* 456 U.S. 994 (1982); *United States v. Rodriguez,* 63 F.3d 1159, 1164 (1st Cir.) ("It is settled that trial generally 'commences' for Speedy Trial Act purposes on the day the jury is empaneled, even if not sworn."), *cert. denied,* 516 U.S. 1032 (1995).
     Tenth Circuit decisions adopt the voir dire standard.  Trial therefore usually "commences" for Speedy Trial Act purposes with voir dire, but can be deemed to have commenced later if the beginning of trial is unduly delayed after jury selection.  That is not the case here.  The jury selection, empanelment, and trial began on September 11, 2006.  *E.g., United States v. Arnold,* 113 F.3d 1146, 1149 (10th Cir. 1997) ("For purposes of the STA, a jury trial commences with the voir dire."), *overruled on other grounds, see United States v. Hill,* 539 F.3d 1213, 1216 (10th Cir. 2008); *United States v. Andrews,* 790 F.2d 803, 808 (10th Cir. 1986) (Speedy Trial Act violation where "a delay of over two and one-half months occurred between voir dire and the day on which testimony was scheduled to begin"); *United States v. Martinez,* 749 F.2d 601, 604 (10th Cir. 1984) (agreeing that trial "commenced" on the day the "jury was selected" and rejecting that trial commenced a month later with opening statements), *abrogation on other grounds recognized by United States v. Nichols,* 877 F.2d 825 (10th Cir. 1989).

seeking a continuance stopped the speedy trial act clock until it was ruled on.

Third, Petitioner misunderstands the import of the language used by Judge Johnson in his orders granting the continuances.  Benally believes that Judge Johnson's "parroting the same rote rationale for granting continuances" is evidence that the judge inappropriately granted continuances based upon caseload concerns.  *Doc. 9* at 7.  As with the others following, the first defense motion set out in detail the grounds for the requested continuance.  *United States v. Benally,* CR 05-1854 WJ (Doc. 10 at 1-2).  Using the form submitted by counsel, Judge Johnson granted the "unopposed motion . . . for good cause," because "the ends of justice served by this continuance outweigh the interests of the defendant and the public in a speedy trial," and noted the time to be excluded.  *See id.* (Doc. 11 and docket entry text).  Thereafter, each of the continuances granted followed the same pattern, and Petitioner argues that this is suspect.

Contrary to Petitioner's contention, the "boilerplate" language regarding the "ends of justice" used in the orders does not indicate that the continuances were granted "to accommodate counsel's busy caseload."  *Doc. 9* at 7.  Judge Johnson knew that in the absence of the required "ends of justice" finding, the speedy trial clock would continue to tick:

> No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

*See* 18 U.S.C. § 3161(h)(7); *see also Zedner*, 547 U.S. at 489 ("A straightforward reading of these provisions leads to the conclusion that if a judge fails to make the requisite findings regarding the need for an ends-of-justice continuance, the delay resulting from the continuance must be counted").

Relying on the reasons recited in Petitioner's motions, Judge Johnson found "good

cause" to grant the relief Benally had requested through his attorney rather than forcing an earlier trial with an inadequately prepared attorney. "In setting forth its findings . . . , the district court need not articulate facts which are obvious and set forth in the motion for the continuance itself." *United States v. Toombs*, 574 F.3d at 1269 (quoting *United States v. Occhipinti*, 998 F.2d 791, 797 (10th Cir. 1993)) (internal quotation marks omitted). Tenth Circuit decisions following the Supreme Court's decision in *Zedner*, however, have held that "[a] record consisting of only short, conclusory statements lacking in detail is insufficient." *Toombs* at 1271. The record must explain "why the mere occurrence of the event identified by the party as necessitating the continuance results in the need for additional time. . . . Simply identifying an event, and adding the conclusory statement that the event requires more time for counsel to prepare, is not enough." *Id.* at 1271–72. Clearly "ends-of-justice continuances should not be granted cavalierly." *United States v. Williams*, 511 F.3d 1044, 1049 (10th Cir. 2007).

I note that the first four continuances were granted before Judge Johnson had guidance from the *Zedner* June 5, 2006 opinion. *See id.* (Doc. 11 – granted 11/17/05, Doc. 23 – granted 1/26/06, Doc. 26 – granted 3/23/06, Doc. 34 – granted 4/20/06, Doc. 37 – granted 6/29/06). In this habeas context, one could hardly fault Judge Johnson for incorporating rather than reiterating the motion's detailed reasons why a continuance was sought, such motions including not only events but often explanations why other alternative relief could not suffice.

But even if the continuance orders could be read as deficient under new case law, it would not entitle Petitioner to relief. A petitioner in habeas must "demonstrat[e], from his attorney's perspective ***at the time***, that it was objectively unreasonable not to bring a motion to dismiss on Speedy Trial Act grounds." *Parisi v. U.S.*, 529 F.3d 134, 141 (2nd Cir. 2008) ("*Zedner*, with its reinforcement of the categorical nature of the ends-of-justice requirement,

issued years after [petitioner] pleaded guilty.") (emphasis added). Indeed, the Tenth Circuit's December 20, 2007 in *Williams* upon which Petitioner relies was issued after Petitioner's second trial and sentencing.

Moreover, the United States had filed its motion for a *Daubert* hearing months before the *Zedner* decision, again thereby stopping the speedy trial clock on pending motions grounds from April 11, 2006, through the briefing and decision on September 1, 2006. *See id.* (Doc. 28 – United States motion filed 4/11/06, Doc. 38 – notice of hearing for 7/23/06, Doc. 39 – response to motion filed 7/20/06, Doc. 42 – reply filed 7/31/06, Docs. 44-46 – defense motion to file surreply granted and surreply filed 8/14/06; Doc. 58 – hearing announcing ruling after review). Petitioner does not challenge the speedy trial clock effects of this United States motion.

In summary, even wholly ignoring the United States' first motion in limine, neither *Zedner*, *Williams* nor *Toombs* were in existence when Mr. Finzel was submitting the forms used by the Court in granting continuances. As such, neither Mr. Finzel nor Judge Johnson can be faulted for failing to supply the detail Petitioner argues those decisions require.[18] In fact, the Tenth Circuit continues to clarify its view of what *Zedner* demands. *See United States v. Larson*, No. 09-4172 (10th Cir. December 20, 2010).[19]

---

[18] After the *Zedner* decision, the proposed orders for continuances expressly incorporated the phrase "for the reasons set out in the motion." *See United States v. Benally,* CR 05-1854 (Doc. 79). The court also held hearings and issued its own decisions on the continuances. *See id.* (Docs. 85-86, 90-91); *but see also United States v. Toombs,* 574 F.3d 1262, 1272 (10th Cir. 2009) (court must "inquire about or consider whether the respective events at issue necessarily required additional preparation.").

[19] Alternatively, even if *Zedner* and *Williams* did apply, because Judge Johnson plainly relied on the detailed grounds cited by the defense in its motion, the boilerplate "ends of justice" finding would arguably satisfy both decisions. *E.g., Williams,* 511 at 1057 ("We have observed that although 'the trial court must make explicit findings regarding why granting the continuance will strike a proper balance between the ends of justice and the best interest of the public and the defendant in a speedy trial,' . . . it 'need not articulate facts which are obvious and set forth in the motion for the continuance itself.'") (quoting *United States v. Doran,* 882 F.2d 1511, 1515 (10th Cir. 1989) and *United States v. Occhipinti,*

Finally, any arguable Speedy Trial Act violation could not be the basis for habeas relief. The habeas statutes allow federal courts to grant the writ if there is a violation of either "the Constitution" or the "laws" of the United States.[20]  Notwithstanding the "laws" language of the statutes, it is well and long settled that "laws" violations are not cognizable in habeas proceedings unless the error is of such a "fundamental character" that it constitutes a "complete miscarriage of justice."

> While the remedy is in this sense comprehensive, it does not encompass all claimed errors in conviction and sentencing.  Habeas corpus has long been available to attack convictions and sentences entered by a court without jurisdiction. . . .  In later years, the availability of the writ was expanded to encompass claims of constitutional error as well. . . .  But unless the claim alleges a lack of jurisdiction or constitutional error, the scope of collateral attack has remained far more limited. . . .  The Court has held that an error of law does not provide a basis for collateral attack unless the claimed error constituted "a fundamental defect which inherently results in a complete miscarriage of justice." . . .
>
>      Similar limitations apply with respect to claimed errors of fact.  The justification for raising such errors . . . is that traditionally they could have been raised by a petition for a writ of coram nobis. . . .  But coram nobis jurisdiction has never encompassed all errors of fact; instead, it was of a limited scope, existing "in those cases where the errors were of the most fundamental character, that is, such as rendered the proceeding itself irregular and invalid." . . .  The claimed error here – that the judge was incorrect in his assumptions about the future course of parole proceedings – does not meet any of the established standards of collateral attack. There is no claim of a constitutional violation; the sentence imposed was within the statutory limits; and the proceeding was not infected with any error of fact or law of the "fundamental" character that renders the entire proceeding irregular and invalid.

---

998 F.2d 791, 797 (10th Cir.1993), respectively, and omitting internal quotation to *United States v. Lattany,* 982 F.2d 866, 879 (3rd Cir. 1992), *cert. denied,* 510 U.S. 829 (1993)).

  [20]  *See* 28 U.S.C. § 2241(c)(3) ("The writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States"); *id.,* § 2254(a) (federal judges "shall entertain an application for a writ of habeas corpus [by] a person in [state] custody . . . only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."); *id.,* § 2255(a) ("A prisoner . . . claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court . . . to set aside or correct the sentence").

*United States v. Addonizio,* 442 U.S. 178, 185-86 (1979).[21]  Because there is no speedy trial violation of any constitutional magnitude here, any violation of the Speedy Trial Act would not afford Petitioner any habeas relief.[22]  For each of these independent reasons, Petitioner either fails to establish a Speedy Trial Act violation or fails to establish a violation of the magnitude that would warrant habeas relief.

### 3.  Ineffectiveness With Regard To Speedy Trial

Petitioner's speedy trial claims are cast in an ineffective assistance of counsel posture but here, too, his claim fails because he cannot establish either *Strickland* prong.  First, the continuances were plainly related to the defense need to become thoroughly prepared for trial.  Therefore, under the first *Strickland* prong, Petitioner cannot overcome the presumption that counsel's requests for them were a matter of "sound trial strategy."  *Strickland,* 466 U.S. at 689; *see also, c.f., id.* at 690 ("choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *O'Brien v. United States,* 2010 WL 55887 at * 3 (S.D. Cal. 2010) ("Given the number of defendants, multitude of charges, voluminous discovery, and complexity of the issues in the case, it would have been virtually impossible for

---

[21]  *See also, e.g., Reed v. Farley,* 512 U.S. 339, 353-55 (1994); *Stone v. Powell,* 428 U.S. 465, 477 n. 10 (1976); *Hill v. United States,* 368 U.S. 424, 428 (1962); *United States v. Talk,* 158 F.3d 1064, 1069 (10th Cir. 1998), (abrogation on other grounds recognized, *United States v. Harms*, 371 F.3d 1208, 1210 (10th Cir. 2004)), *cert. denied,* 525 U.S. 1164 (1999);  *Knox v. Wyoming Dep't of Corrections State Penitentiary,* 34 F.3d 964, 968 (10th Cir. 1994), *cert. denied sub nom.,* 514 U.S. 1091 (1995).

[22]  *See United States v. Cook,* 48 F. Supp. 2d 776, 777-78 (N.D. Ill. 1999) ("The Speedy Trial Act violation alleged here is cognizable in a Section 2255 proceeding only if it constitutes a fundamental defect in the trial resulting in a complete miscarriage of justice."); *United States v. Baily,* 1995 WL 302441 at * 8 (N.D. Ill. 1995) ("A claim of legal error, as opposed to constitutional or jurisdictional error, is not cognizable in section 2255 proceedings unless the error constitutes a fundamental defect in the trial resulting in a complete miscarriage of justice.  [*Addonizio*].  A violation of the Speedy Trial Act, even if present (a proposition for which the Court finds no support), would not serve as grounds for granting Bailey's section 2255 petition."), *aff'd,* 106 F.3d 404 (7th Cir.), *cert. denied,* 522 U.S. 889 (1997).

her counsel to mount a competent defense within the confines of the Speedy Trial clock.
Therefore, the Court finds Petitioner's counsel was not ineffective for entering the stipulation to
allow sufficient time to prepare Petitioner's defense.").

Petitioner cites guidelines that the American Bar Association published in 2009 concerning
attorney workloads, *Doc. 9* at 9-10, and argues that Mr. Finzel thus "had an obligation to cure
the conflict by seeking to be relieved" instead of moving for continuances, *id.* at 11.[23]  Although
ABA standards can be "guides to determining what is reasonable," they are "only guides" and
not "inexorable commands."  *Padilla v. Kentucky,* 130 S. Ct. 1473, 1482 (2010) (and Supreme
Court cases cited therein).  Moreover, the guidelines he cites were not in existence until after the
Tenth Circuit decided Petitioner's direct appeal, which alone is grounds to reject this argument.

Moreover, Mr. Finzel's other cases were not the sole basis for the continuances.  The only
instance Petitioner cites where an actual conflict of pending cases was mentioned was the last
motion for continuance filed by the defense before the then-scheduled July 2006 trial.  But, by
the time that continuance was requested the *Daubert* matters were still pending but unresolved,
and the principle reason for this motion to continue the trial was because the defense expert
would not be available for the *Daubert* hearing before the then-set trial date.  *See Doc. 9* at 10;
*see also United States v. Benally,* CR 05-1854 (Doc. 36 at 1 – "Pursuant to a telephone
scheduling conference between the parties on April 13, 2006, the date for a *Daubert* hearing was
to be based on the availability of the expert and counsel.  It was believed that that date would not
be before July 5, 2006.  A determination of the admissibility of the expert's testimony should be
made prior to trial.").  Although an earlier defense motion recited Mr. Finzel's time spent

---

[23]  These guidelines were published in August 2009 and are available online.
*See* www.abanet.org/legalservices/sclaid/defender/downloads/eight_guidelines_of_public_defense.pdf

preparing for other matters, Mr. Finzel was also involved in discussions with Dr. Davis about her testimony, and he acknowledged that there had not been "enough time to prepare, provide notice to the government, and allow the government the opportunity to prepare to challenge this expert" before the trial setting.  *Id.* (Doc. 25 at 1-2).[24]

Second, because there is no violation of the Sixth Amendment or the Speedy Trial Act, counsel cannot be deemed deficient for failing to raise a speedy trial claim before the trial court. Attorneys are not ineffective for failing to raise meritless challenges, or to anticipate changes in the law.  *E.g., Sperry v. McKune,* 445 F.3d 1268, 1275 (10th Cir.) (failure to raise a meritless claim is not ineffective assistance of counsel), *cert. denied,* 549 U.S. 1039 (2006); *Sherrill v. Hargett,* 184 F.3d 1172, 1179 (10th Cir.) (failure to anticipate change in law is not ineffective assistance of counsel), *cert. denied,* 528 U.S. 1009 (1999); *Battle v. Workman,* 353 Fed. App'x 105, 110 (10th Cir. 2009) ("Obviously, appellate counsel's assistance could not have been ineffective merely because he failed to anticipate a change in the law before it occurred.").[25]

Likewise, Petitioner cannot establish prejudice.  I believe the underlying premise to both of

---

[24]  Indeed, the United States had opposed a prolonged delay based on the schedule of the defense expert.  *See United States v. Benally,* CR 05-1854 WJ (Doc. 32 at 1-2 – "the date for a *Daubert* hearing cannot yet be set.  Counsel for defendant will be promptly determining the availability of the expert so that a date for a *Daubert* hearing can be determined . . . Counsel for the government . . . understands the reasons for this requested continuance.  He nonetheless opposes it.  He understands, however, and has requested a need for a *Daubert* hearing.").

[25]  *See also United States v. McDonald,* 2009 WL 1636137 at * 10 (N.D. Iowa 2009) ("Because this court can find no violation of the Speedy Trial Act or McDonald's Sixth Amendment rights, McDonald cannot establish that his counsel was deficient for failing to move to dismiss his case on the grounds that his speedy trial rights had been violated."); *Parisi v. United States,* 529 F.3d 134, 141 (2nd Cir. 2008) ("Parisi has not demonstrated, from his attorney's perspective at the time, that it was objectively unreasonable not to bring a motion to dismiss on Speedy Trial Act grounds.  *Zedner,* with its reinforcement of the categorical nature of the ends-of-justice requirement, issued years after Parisi pleaded guilty. . . . Under *Strickland,* we must consider the circumstances counsel faced at the time of the relevant conduct") (internal quotations and citations omitted), *cert. denied,* 129 S Ct. 1376 (2009).

his speedy trial act claims is that if counsel had raised the claim or if he establishes a violation here, then this Court "would have had no choice but to dismiss these charges with prejudice." *Doc. 9* at 15.  With respect to the Speedy Trial Act, however, the trial judge has discretion to dismiss the indictment without prejudice, and the defendant can thus be retried even if the statute of limitations has expired for the crime.[26]  And, even though dismissal would be required to remedy a Sixth Amendment violation,[27] Petitioner cannot establish *Strickland* prejudice where there is no merit to the claim.

## 4.  Speedy Trial Conclusion

Whether cast as independent Sixth Amendment and statutory claims, or as an ineffective assistance of counsel claim, Petitioner's arguments are without merit and afford no basis for habeas relief.

---

[26]  *See, e.g., Toombs,* 574 F.3d at 1276 ("we . . . reverse the denial of the motion to dismiss on Speedy Trial Act grounds, and remand for proceedings consistent with this opinion.  On remand, the district must decide whether to dismiss the indictment with or without prejudice."); *Williams,* 511 F.3d at 1049 (The sanction for violation of the Act is mandatory dismissal of the indictment.  18 U.S.C. § 3162(a)(2).  However, the district court retains 'broad discretion whether to dismiss the indictment with or without prejudice.' . . .  When an indictment is dismissed without prejudice, the prosecution may seek a new indictment within six calendar months of the date of the dismissal, even if the period prescribed by the applicable statute of limitations has expired.  18 U.S.C. § 3288.").

[27]  *See Reed,* 512 U.S. at 368 ("The dismissal with prejudice of criminal charges is a remedy rarely seen in criminal law, even for constitutional violations.") (citing as examples *Barker* for Sixth Amendment speedy trial violation and *Oregon v. Kennedy,* 456 U.S. 667(1982) for Double Jeopardy Clause violation); *Barker,* 407 U.S. at 522 ("The amorphous quality of the right also leads to the unsatisfactorily severe remedy of dismissal of the indictment when the right has been deprived.  This is indeed a serious consequence because it means that a defendant who may be guilty of a serious crime will go free, without having been tried. Such a remedy is more serious than an exclusionary rule or a reversal for a new trial, but it is the only possible remedy."); *Toombs,* 574 F.3d at 1274 ("Because a district court has discretion to dismiss the case with or without prejudice upon a Speedy Trial Act violation, we also consider *Toombs's* Sixth Amendment speedy trial claim, which, if successful, would require the district court to dismiss the case with prejudice.").

## B.  Motion To Suppress Confession

Petitioner next asserts that Mr. Finzel was ineffective because he failed to move to suppress Benally's statements to the FBI.  *Doc. 9* at 16.[28]  Mr. Finzel requested additional time to explore the option of filing a suppression motion but ultimately did not file one.  Petitioner recognizes that Mr. Finzel chose not to file a suppression motion "as a matter of strategy" because Petitioner was "not under formal arrest [and, as such,] the rights mandated by *Miranda* were inapplicable."  *Id.*[29]  This admission essentially defeats the claim at the outset.[30]

---

[28]  Petitioner's written statement is on a form entitled "WRITTEN STATEMENT (non-custodial)."  *Daubert Hearing Transcript 7/24/06,* Exh. C.  The statement begins with the pre-printed acknowledgments that:  Petitioner "freely and voluntarily" made the statement to officers he knew to be FBI agents; the agents advised him of "the nature and purpose of the signed statement;" Petitioner "was not under arrest," "did not have to answer questions or provide information," and "was free to leave (or could ask the interviewing agents to leave) at any time;" and "no promises or threats [were] made . . . and no pressure or coercion [was] used . . . to make [him] make [the] statement."  *Id.*  The preamble further indicated that Petitioner had "completed the 12 grade," can "read and write the English language," and was "not under the influence of any substance."  *Id.*  Petitioner then handwrote this paragraph:

> I, Alden J. Benally am very sorry for inappropriat[e]ly touching Whitney . . . and Necole (sic) . . . .  Please accept my apology for my wrong doing.  I am writing to express myself about my actions.  I feel this shouldn't have happened if I maintained myself.  Because the girls flirted with me I was unable  to control myself.  For this I am sorry.  I touched Whitney approximately 5 times and Necole (sic) 1 time on their vagina[s].  I did not put my fingers inside.  I touched the top part of the vagina, and not inside.  Please understand how sorry I am and that would like to resolve this matter.  I am trying to live a good life with my family to provide and support for them.  Your understanding will greatly be appreciated."

*Id.*, *see also Daubert Hearing Transcript 7/24/06* at 38-44.

[29]  Mr. Finzel also contemplated bringing a motion to suppress before the first and second trials. *See United States v. Benally,* CR 05-1854 WJ (Doc. 12 – defense motion seeking extension to file pretrial motions before first trial because "Counsel has been investigating the facts and circumstances of this case.  Counsel now believes that there will be a pretrial motion filed in this case. . . .  Once an investigation has been completed, counsel will then be in a position to file any appropriate pretrial motions."); *id.* (Doc. 81 at 2 – joint motion to continue second trial included reason that "counsel plans to file a motion to suppress the defendant's statement based on the information that came forth in the course of the trial. That cannot be done in the time available.").

The reason for not bringing the first motion was explained on the record.  *See Daubert Hearing Transcript 7/24/06* at 3-4 ("We've elected not to file a suppression motion.  The defendant was not in custody, and there are other matters involved that wouldn't be productive."); *Partial Trial Transcript*

The United States argues that no evidentiary hearing is needed on this issue because Petitioner's own testimony at the *Daubert* hearing establishes that "there was no support in fact or law for the proposition that the interview of the Petitioner was the functional equivalent of a formal arrest." *Doc. 15* at 12. Thus, Mr. Finzel "reasonably made a strategic and ethical decision not to file a frivolous motion" that "would have been summarily denied by the district court." *Id.* ecause the motion would not have been successful, Petitioner cannot establish prejudice. *See id.* at 10-13. I agree with the United States that this is the correct result and incorporate its reasoning and authorities herein. To that I add these additional observations.

Petitioner believes that the Supreme Court decision in *Missouri v. Seibert,* 542 U.S. 600 (2004), condemned the "'question first, Mirandize later' interrogation strategy," and contends that this was "exactly what happened on February 15, 2005 in regards to Petitioner's 'confession.'" *Doc. 9* at 18. The complicated *Seibert* case, however, does not flatly hold that any time officers utilize the technique a defendant's statement is automatically excluded for all

---

*9/12/06* at 21-22 (Mr. Finzel reiterating his objections to admission of Petitioner's written statement stating: "We never tried to suppress that. We've tried to put an expert on. . . . I would object to [admission of the statement because] I don't have my expert to put on to explain it, but [no grounds to object] per se.").

 The reason for not bringing the second motion was not explained, but I disagree with Petitioner that Mr. Finzel's contemplation of a suppression motion before the second trial is somehow a "tacit admission" that he committed a prejudicial error. *See Doc. 9* at 17. A statement in Mr. Finzel's brief on appeal leads me to believe that he did not consider the confession "involuntary." *United States v. Benally,* Docket No. 07-2194 (Doc. 0101124126 – Defendant Brief In Chief filed 2/4/08 at 33 – "his otherwise voluntary confession." Also, the factors relevant to the "in custody" and "voluntariness" issues did not change from the first trial to the second trial. Thus, even if Mr. Finzel wanted to consider bringing a motion to suppress, any such motion would have been unsuccessful.

[30]  *C.f., Cummings v. Sirmons,* 506 F.3d 1211, 1225 (10th Cir. 2007) ("With respect to trial counsel's alleged failure to challenge Cummings' confession . . . lead trial counsel . . . testified [at an evidentiary hearing] that Cummings' claim of complete innocence was, in his view, 'incredulous,' . . . and that he (Faulk) therefore made a strategic decision that it was not viable to pursue such a defense theory. In light of this undisputed testimony, we conclude that Faulk made a reasonable strategic decision that cannot be the basis for a valid ineffective assistance claim."), *cert. denied,* 128 S. Ct. 2943 (2008).

purposes.[31]

Petitioner also cites *Seibert* and *Oregon v. Elstad,* 470 U.S. 298 (1985), for the proposition

that any statements made before *Miranda* warnings are "'irrebuttably presumed involuntary'"

and cannot be used in the prosecution's case-in-chief.  *Doc. 9* at 18.  That is true as a general

proposition if Petitioner's confession was given in a "custodial" setting.  *Miranda, Seibert,* and

*Elstad*, however, do not apply unless Petitioner was subject to "custodial" interrogation, and the

latter two cases are inapplicable unless Petitioner actually received *Miranda* warnings.[32]  As the

form the FBI agents used for Petitioner's written statement indicates, they took the position that

Petitioner was never in custody.  For that reason, they did not issue *Miranda* warnings to

Petitioner at any time during their interview with him.[33]

---

[31]  *See, e.g., United States v. Carrizales-Toledo,* 454 F.3d 1142, 1150 (10th Cir.) ("Although the Court held that statements obtained through such a two-step technique are inadmissible, none of the opinions in *Seibert* received the votes of five Justices."), *cert. denied,* 549 U.S. 1065 (2006).

[32]  To oversimplify somewhat, the three cases deal with the timing of the admission and timing of the warnings.  If Petitioner was "in custody" then he was entitled to *Miranda* warnings.  If he was in custody but did not receive the *Miranda* warnings until "the middle"of a two-step interrogation, after he had already revealed something incriminating, then *Seibert* considerations are applicable.  If Petitioner made post-*Miranda* warning incriminating statements, then *Elstad* applies.  *See Seibert,* 542 U.S. at 604 ("This case tests a police protocol for **custodial interrogation** that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession.  Although such a statement is generally inadmissible, since taken in violation of *Miranda* . . . the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time.  The question here is the admissibility of the repeated statement.") (emphasis added); *Elstad,* 470 U.S. at 309 ("Because *Miranda* warnings may inhibit persons from giving information, this Court has determined that they need be administered **only after the person is taken into 'custody'** or his freedom has otherwise been significantly restrained.") (emphasis added); *see also, e.g., Carrizales-Toledo,* 454 F.3d at 1153 ("In *Elstad,* the Court held that the subsequent administration of *Miranda* warnings after a voluntary but unwarned **custodial confession** will remove the conditions that precluded admission of the earlier statement.") (emphasis added, internal quotations omitted); *c.f., United States v. Cook,* 599 F.3d 1208, 1216 (10th Cir.) ("Like *Edwards, Mosley* rests on the holdings in *Miranda,* and thus, the outcome in *Mosley* turned on whether his statements were the product of custodial interrogation.") (emphasis added), *cert. denied*, ___ S. Ct. ___, 2010 WL 2989796 (2010).

[33]  When asked about the significance of the "noncustodial" designation on the form, Agent Sayegh testified that because they never had any intention of arresting Mr. Benally or he certainly wasn't

Petitioner recognizes that *Miranda* warnings are not required unless he was "in custody" and that "custody" is an objective inquiry.  *Doc. 9* at 19.  He therefore outlines the factors he believes caused his FBI interview to have been conducted in an "objectively custodial" setting.  *Id.* at 20-23.  Yet, his entire argument is built on his alleged ***subjective*** "cognitive challenges."  *Id.* at 15.  He relies on:  his inability to "deal with pressure," his desire to "avoid confrontation," his "Native American" heritage and being "raised on reservation" instilled him with a "fear of government authorities" and made him "suscepti[ble] to police coercion."  *Id.* at 16-19.  His position is that these subjective considerations are "central to an appropriate determination" that his statement "was unlawfully obtained by the FBI and should have been suppressed."  *Id.* at 15-16.

By using subjective criteria to make an argument for the objective custody inquiry, I believe Petitioner is either trying to fit a "voluntariness" claim into the *Miranda* "custody" framework, or is confusing the two concepts.  Though some of the same factors are relevant to both theories, the two inquiries are distinct.  "'[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'"  *United States v. Krehbiel,* 378 Fed. App'x 832, 834 (10th Cir. 2010) (quoting *Stansbury v. California,* 511 U.S. 318, 323 (1994)).  "The question is whether 'a reasonable person [would] have felt he or she was not at liberty to

_____

in custody, [they used] a different form, a noncustodial form."  *Partial Trial Transcript (Sayegh) 9/12/06* at 23; *see also, e.g., United States v. Patane,* 542 U.S. 630, 639 (2004) ("statements taken without *Miranda* warnings (though not actually compelled) can be used to impeach a defendant's testimony at trial, *see Elstad*); *id.* at 641 ("Our cases also make clear the related point that a mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule. . . .  It follows that police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda.*  Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial.").

terminate the interrogation and leave.'" *Id.* (quoting *Thompson v. Keohane,* 516 U.S. 99, 112 (1995)).  "A person is in custody for purposes of *Miranda* when his 'freedom of action is curtailed to a degree associated with formal arrest.'" *Id.* (quoting *Thompson,* 516 U.S. at 112 and omitting internal quotations).  "This is an objective question, focusing on whether, given the totality of the circumstances, 'a reasonable [person] in the [defendant's] position would have understood [the] situation . . . as the functional equivalent of a formal arrest.'" *Id.* (quoting *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984)).

Petitioner considers "coercive" certain statements allegedly made by Agent Sayegh.  After Petitioner initially denied the girls' allegations several times, Agent Sayegh indicated that he was dubious.  He then allegedly said that he knew Petitioner wanted to be with his family, that Petitioner should cooperate with them, and that Petitioner could be taken away in handcuffs.[34]  Benally maintains that he believed that if he did not cooperate by lying and admitting his guilt, then he would be arrested on site and not returned to his family.  Conversely, if he cooperated and admitted he molested the girls, then he would be free to leave and the entire matter would be dropped.  Agent Sayegh denied making any such direct statement or implying those were Petitioner's only two choices.  *See Partial Trial Transcript (Sayegh) 9/12/06* at 12-13, 34, 41-43; *Second Trial Transcript Vol. I* at 54-76, 89-112.

---

[34] *See Daubert Hearing Transcript 7/24/06* at 38 ("Like [Agent Sayegh] said, 'All I want to do is talk to you, and after that, you get to go home.  You get to go – you get to be with your family.'  And in that way, that's how I gave him what he wanted."); *id.* at 63-64 ("they said that just work with them, tell them what they want, and by telling them what they want to know or for what they want to hear from me, for me to say to them, I can go back and be with my daughter and my family"); *id.* at 76 ("'we know you want to be with [your daughter].  You want to be with your family.  So work with us, and you can be with your family.'  And I told him, 'I am working with you.'  [AS] 'You're not telling us what we want.'  And I said, 'I am telling you.'  And he goes, 'We don't' want to be the bad guys in this.  We want to be the good guys to you.  We can walk out – you can walk out [of] here in handcuffs if we want to, but we don't want to do that.  We want to be the good guys.  Let us be the good guys." . . . I didn't want to walk out in handcuffs.  That's what I was thinking.").

Even if the statements were made, under the totality of the circumstances, the setting was objectively "noncustodial."  No reasonable person in Petitioner's position would have understood that he was under the functional equivalent of a formal arrest.  From Petitioner's own descriptions of the encounter, it is undisputed that the agents approached Petitioner at work, did not reveal the reason for their visit in the presence of his colleagues or bosses, and asked him if they could speak to him privately.  Petitioner asked his boss if there was a "private" room they could use, and the agents followed him to the room chosen for their discussion.  They positioned themselves at the far corners of the room, opposite the door.  They specifically informed Petitioner that he was not under arrest and was free to leave.  Nor did they manhandle or even touch him, block the doorway, train a gun on him, raise their voices, or engage in any other such physically intimidating conduct.  They behaved "politely" and "professionally."  Agent Sayegh's questioning cannot be characterized as "accusatory," much less a prolonged episode of that sort of questioning.  Petitioner, for example, had known about the girls' accusations from his family members, including his wife, months before the agents appeared to question him.  According to his rendition of their discussion, his initial denials were few and of short duration.  Thereafter, he readily responded to the agent's specific questions in a conversational manner.  Furthermore, Petitioner speaks and understands English as his native language, is educated, and had no psychological- or drug-related condition that effected him at all during the discussion.  He also filled-in and signed a written statement labeled "noncustodial," specifically reciting that no coercion was brought to bear on him, that he was not under arrest and that he was free to leave, and that the statement was entirely voluntary.[35]  *See, e.g., Daubert Hearing Transcript 7/24/06*

---

[35] Petitioner also asserts that Agent Sayegh prompted the content of his written statement by suggesting topics to cover while Petitioner was writing. *See id.* at 16-17, 19-20, 40-44, 67-69, 78-85, 90-

at 10-16, 46-49, 53-102; *id.,* Exhs. A, C.

Indeed, more objectively intimidating circumstances have been held to be noncustodial.[36]

Even if Petitioner had been questioned in a police station, the fact that he was expressly advised

he was free to leave by the agent at the outset and on the form would defeat his claim.  *See*

*United States v. Jones,* 523 F.3d 1235, 1240 (10th Cir. 2008) ("'That a person is told repeatedly

that he is free to terminate an interview is powerful evidence that a reasonable person would

have understood that he was free to terminate the interview.'") (quoting *United States v.*

*Czichray,* 378 F.3d 822, 826 (8th Cir. 2004), *cert. denied,* 544 U.S. 1060 (2005)); *id.* ("Chee was

interrogated in a police-station office, with two officers in the room. . . . But despite the location

of the interview, we found the totality of the circumstances supported a finding of no custody

when, during the interview, the suspect was told, among other things, that 'he was not under

arrest and was free to leave.'") (quoting *United States v. Chee,* 514 F.3d 1106, 1144 (10th Cir.

2008)).

Moreover, the "seemingly contradictory statements: . . . not under arrest, but . . . could be

arrested," alleged here at best convey that Petitioner was the subject of an investigation and that

the agents have the power to arrest him.  *Id.* at 1240.  Neither is sufficient to turn an encounter

into a "custodial" one.  *See id.* at 1241 ("'[a]ny interview of one suspected of a crime by a police

_____

96, 100-04; *Partial Trial Transcript (Alden Benally ) 9/13/06* at 29-46; *Second Trial Transcript Vol. II* at 402-04, 407-34; *Second Trial Transcript Vol. III* at 442-45.

   [36]  *E.g., Krehbiel,* 378 Fed. App'x at 834-835 (where defendant alleged "at least one officer had his gun drawn when he entered the motel room, the questioning was "accusatory," the officers were blocking the only exit, and the officers never told him that he was free to leave or that he did not have to answer their questions" was not custodial because gun was not trained on defendant during questioning, questioning was brief and not hostile, the size of the room resulted in an officer blocking the exit, defendant invited the officers to the room used; under those circumstances, the fact that the officers did not tell the defendant he was free to leave or free to decline to answer was not dispositive).

officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part

of a law enforcement system which may ultimately cause the suspect to be charged with a

crime.' . . .  An unstated threat of coercion inherent in the officers' power to arrest is, taken

alone, not enough.") (quoting *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977)); *id.* ("'Even a

clear statement from an officer that the person under interrogation is a prime suspect is not, in

itself, dispositive of the custody issue, for some suspects are free to come and go until the police

decide to make an arrest.'") (quoting *Stansbury v. California,* 511 U.S. 318, 325 (1994)).

Indeed, had the officers had employed handcuffs at some point, that fact would not

conclusively establish coercion.  *See Wilson v. Oklahoma,* 363 Fed. App'x 595, 615 (10th Cir.

2010) ("The fact Wilson was handcuffed is not determinative.") (citing and quoting *United

States v. Cardenas,* 410 F.3d 287, 295 (5th Cir. 2005) where it states that "[s]uch basic police

procedures as restraining a suspect with handcuffs have never been held to constitute sufficient

coercion to warrant suppression."), *cert. denied,* ___ S. Ct. ___, 2010 WL 2175445 (2010).

Thus, Agent Sayegh's alleged statements in no way presented Petitioner with a "Hobson's

choice" of certain arrest.  *E.g., Jones,* 523 F.3d at 1241 (distinguishing *United States v.

DiGiacomo,* 579 F.2d 1211 (10th Cir. 1978), where the officers made it plain that the suspect was

going to be arrested but could choose between being arrested immediately or surrendering

voluntarily the following morning)).

Finally, for the moment, I will assume that Agent Sayegh's alleged "we can arrest"

statements to some degree undercut the "objective force" of the "you're free to leave"

statements.  *Id.* at 1250.  Under the totality of the facts here, the degree of  "undercutting" would

be none to minimal.  Thus, as Mr. Finzel concluded, since there was no "custody," there was no

basis to bring a suppression motion based on the lack of *Miranda* warnings.

Alternatively, an "involuntary" confession given in a noncustodial setting can be an independent basis to suppress.[37]  Like the custody inquiry, a "totality of the circumstances" test is used, and the factors include Petitioner's age, intelligence, and education; the length and nature of the questioning, whether he was subjected to physical punishment, and whether he was advised of his constitutional rights.[38]  The last factor appears to be inapplicable as no *Miranda* warnings were necessary because Petitioner was not in custody.[39]  For the same reasons as

---

[37]  *E.g., Beckwith v. United States,* 425 U.S. 341, 347-48 (1976) ("noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'") (quoting *Rogers v. Richmond,* 365 U.S. 534, 544 (1961)); *see also, e.g., Colorado v. Connelly,* 479 U.S. 157, 167 (1986) ("Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the due process clause."); *Burnett v. Blackburn,* 160 Fed. App'x 662, 665 (10th Cir. 2005) ("There is some ambiguity about whether the basis for Ms. Burnett's suppression motion is involuntariness under the Due Process Clause or an invalid *Miranda* waiver.  But the result is the same regardless. . . .  Both tests require us to consider the totality of the circumstances, including the individual characteristics of the defendant.").

[38]  *See, e.g., Carrizales-Toldedo,* 454 F.3d at 1153 ("'The essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne.'") (quoting *United States v. Rith,* 164 F.3d 1323, 1333 (10th Cir.1999)); *see also, e.g., United States v. Cordova,* 340 Fed. App'x 427, 433 (10th Cir. 2009) ("Though Mr. Cordova waived his Miranda rights, the Fifth Amendment still protected him from being forced to make involuntary statements; *United States v. Minard,* 208 Fed. App'x 657, 660 (10th Cir. 2006) 454 F.3d at 1153 ("Involuntariness in the context of both *Miranda* waivers and confessions requires a finding of coercive police action.").

[39]  Involuntariness is not assumed simply because no *Miranda* warnings are given.  *See Elstad,* 470 U.S. at 310 ("The failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised."); *United States v. Pettigrew,* 468 F.3d 626, 635 -638 (10th Cir. 2006) ("Mr. Pettigrew appears to argue that statements made after a *Miranda* violation and before *Miranda* warnings must generally be excluded as inherently coerced.  But 'endowing the psychological effects of voluntary unwarned admissions with constitutional implications' would, practically speaking, immunize a suspect from the consequences of any subsequent spontaneous remarks 'even when the official coercion proscribed by the Fifth Amendment played no part in either . . . confession[ ].' . . .  Such immunity would come 'at a high cost to legitimate law enforcement activity, while adding little desirable protection to the individual's interest in not being compelled to testify against himself.' . . .  Accordingly, a presumption of compulsion stemming from Mr. Pettigrew's prior admissions is not warranted.") (quoting *Elstad,* 470 U.S. at 311, 312).  Even if a failure to advise of constitutional rights somehow factors here, it would be the only factor in Petitioner's favor and it alone does not sway the overwhelming balance of the other factors against finding involuntariness.

above, no remaining factor points toward involuntariness.  Nothing in Petitioner's description of the encounter remotely suggests that his "will" was overborne by the agents' conduct or that his "capacity for self-determination [was] critically impaired."  *Burnett v. Blackburn,* 160 Fed. App'x 662, 665 (10th Cir. 2005) (omitting internal quotations to *United States v. McCullah,* 76 F.3d 1087, 1101 (10th Cir. 1996), *cert. denied,* 520 U.S. 1213 (1997)).  Thus, there also was no basis for Mr. Finzel to bring a suppression motion based on a "voluntariness" argument, either.

A "failure to file a suppression motion does not constitute *per se* ineffective assistance of counsel."  *Kimmelman v. Morrison,* 477 U.S. 365, 384 (1986).  To succeed on a claim of ineffectiveness for counsel's failure to file a motion to suppress, Petitioner "must show that the suppression motion was 'meritorious and that a reasonable probability exists that the [jury's] verdict would have been different absent the excludable evidence.'"  *Burnett,* 160 Fed. App'x at 665 (quoting *Hooper v. Mullin,* 314 F.3d 1162, 1176 (10th Cir. 2002)); *see also, e.g., Kimmelman,* 477 U.S. at 375.

Again for the reasons above, there would have been no merit to a suppression motion on any basis and, therefore, any ineffectiveness claim based on Mr. Finzel's failure to file one is without merit.  *See, e.g., Madlonado v. Burge,* 697 F. Supp. 2d 516, 526-28 & n. 4 (S.D.N.Y. 2010) (noting that Tenth Circuit appears to require that the claim would have succeeded if made); *see also United States v. Husbands,* 2007 WL 141149 at * 9 (N.D. Fla. 2007) ("Defendant would have gained nothing from filing a meritless motion, an act of futility which *Strickland* does not require.  Indeed, as an officer of the Court, counsel is expected to use his best and most reasonable judgment not to waste judicial resources arguing frivolous points.").  Accordingly, I find this claim without merit.

## C.  Claims Based On Daubert Ruling

Petitioner recognizes that he cannot relitigate his challenges to the merits of the *Daubert* decision in these habeas proceedings.  *E.g., United States v. Prichard,* 875 F.2d 789, 791 (10th Cir. 1989) ("Absent an intervening change in the law of a circuit, issues disposed of on direct appeal generally will not be considered on a collateral attack by a . . . § 2255 [petition].").  So, he characterizes the result of the *Daubert* decision as denying him the opportunity to present his "theory of defense."[40]  He then casts the claims in ineffectiveness terms:

> counsel should have moved to suppress the statement given to the FBI by Petitioner. Instead, counsel elected to put all of Petitioner's eggs into the basket of Dr. Davis' testimony regarding reasons people falsely confess.  Without the testimony of an expert qualified to inform the jury as to the reasons people falsely confess, Petitioner's theory of defense was denied to him as that testimony was critical to the development of the defense theory.  Counsel never raised this issue in preparation for the first or second trial.  The Court's denial of permitting Dr. Davis to testify was tantamount to denying Petitioner the ability to construct and present a cohesive theory of defense.  Counsel should have challenged the denial of the expert witness as a violation of Petitioner's right to present a theory of defense and had counsel properly framed and argued the issue there is a reasonable probability that Dr. Davis' testimony would have been admitted and the jury's verdict would have been for an acquittal.

*Doc. 9* at 32.  I find these claims without merit for several reasons.

The "theory of defense" claims are built on two faulty premises.  First, as Petitioner defines it, the defense was that he "did not do the acts alleged against him by Whitney T and Nicole T."  *Doc. 9* at 31.  In other words, the defense "theory" was that Petitioner was innocent,

---

[40]  The specific claims of ineffectiveness include failures at the trial and appellate level.  *See Doc. 9* at 27 ("Counsel failed to argue that the Court's refusal to permit an expert witness to testify regarding his false confession denied Petitioner an opportunity to present his theory of defense."); *id.* at 31 (court's denial of Dr. Davis as defense expert "denied Petitioner the ability to present his theory of defense," and a "criminal defendant 'is entitled to an instruction on his theory of defense if such finds support in the evidence and the law.'"); *id.* at 37-40 (asserting that Mr. Finzel's failure to argue *Daubert* denial on appeal as due process/fairness issue re: defense theory of the case would have changed the outcome of appeal).

and the girls were fabricating the charges. *See e.g., id.* at 28-29 (asserting that the girls' motive was to "concoct" a story and "falsely implicat[e] Petitioner."). This is precisely the theory that the defense pursued at both trials. Dr. Davis' testimony was not the only support for the theory – aside from cross-examination, the defense challenged the girls' credibility based on testimony from members of the girls' immediate and extended families, and on a friendly letter Whitney had written Petitioner after the abuse stopped.[41]

Second, Petitioner is of the view that his "defense had **_no_** merit so long as [his] confession . . . remained in play." *Doc. 9* at 31 (emphasis added). The mistrial and the difficulty the jurors had in reaching a unanimous verdict during the second trial belie that assertion.[42]

Third, law concerning presentation of a defense theory is not absolute. It is true that "'a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor.'" *United States v. (Arvin) Benally,* 146 F.3d 1232, 1235 (10th Cir. 1998) (quoting *Mathews v. United States,* 485 U.S. 58, 63(1988)). A defendant, however, is not entitled to pursue his theory of the case in whatever manner and using whatever evidence he desires:

---

[41] *See, e.g., Partial First Trial Transcript (Sealed) 9/11-12/06* at 17-62 (cross-examination of Whitney); *Partial First Trial Transcript (Sealed) 9/12/06* at 16-27 (cross-examination of Nicole); *Partial First Trial Transcript 9/12/06* at 3-16 (defense witness – defendant's brother Aaron); *Partial First Trial Transcript 9/12/06* at 3-23 (defense witness – Whitney's brother Sidney); *Partial First Trial Transcript 9/12/06* at 3-15 (defense witness – Whitney's sister Cynthia); *Partial First Trial Transcript 9/14/06* at 2-22 (defense closing argument); *Partial Second Trial Transcript 2/12/07* at 14-19 (opening statements); *Second Trial Transcript Vol. I* at 162-83 (cross-examination of Nicole); *Second Trial Transcript Vol. II* at 218-60 (cross-examination of Whitney); *id.* at 274 (defense motion for judgment of acquittal "given the inconsistencies and the lack of corroborating evidence"); *id.* at 289-309 (defense witness – Whitney's sister Cynthia); *Partial Second Trial Transcript 2/15/07* at 28-47 (closing arguments).

[42] The first jury was split 7-5. *See United States v. Benally,* CR 05-1854 (Doc. 131 at 15 – "defendant first went to trial . . . and the jury was unable to come to a verdict . . . having been hung 7-5 for acquittal."). Two jurors were inclined to vote for acquittal in the second trial. See discussion *infra* Section III.E, and excerpts from a juror letter *infra* note 53.

a criminal defendant has a constitutional right to present a defense, but that right "may, in appropriate cases, bow to accommodate other legitimate interests," including those interests embodied in the rules of evidence. *See United States v. Serrano,* 406 F.3d 1208, 1214-15 (10th Cir. 2005) ("A criminal defendant's right to present a defense [thought not absolute] is essential to a fair trial."). While evidence addressing an uncharged crime is not always irrelevant (nor is an instruction addressing a uncharged crime always improper), the district court has discretion to exclude even relevant evidence when the danger of "confusion of the issue, or misleading the jury" greatly outweighs its probative value. FED.R.EVID. 403.

*United States v. Bradshaw,* 580 F.3d 1129, 1135 (10th Cir. 2009), *cert. denied,* 130 S. Ct. 2371

(2010). This brings us back to the *Daubert* ruling itself. Judge Johnson's exclusion of Dr.

Davis' testimony and the Tenth Circuit's affirmance were based on the same legitimate interests

mentioned in the preceding quote – minimal relevance, usurpation of the province of the jury to

determine credibility, potential for confusion by the jurors, and prejudice to the government.

*See Daubert Ruling Transcript 9/1/06* at 10-13; *Benally,* 541 F.3d at 993-96.[43] I thus find no

merit to any of the "*Daubert*-related" claims.

## D.  Petitioner's Decision To Go To Trial And To Testify

The next two claims make factual assertions designed to elicit an evidentiary hearing from

this Court. While some of the facts are in direct opposition, they have no bearing on the facts

---

[43]  To the extent Petitioner is faulting Mr. Finzel for his failure to use the exact phrase "theory of defense" when he was fighting to admit Dr. Davis's testimony and fighting against Judge Johnson' ruling, this is no basis for relief. It was plainly implicit, as well as explicitly argued on appeal, that her testimony was linked to the defense theory. *See, e.g., United States v. Benally,* Docket No. 07-2194 (Doc. 0101124126 – Defendant Brief In Chief filed 2/4/08 at 33 – "This error was anything but harmless. Mr. Benally had a constitutional right to present competent and reliable evidence that his otherwise voluntary confession was still not credible, in light of the physical and psychological conditions that surrounded it. . . . The District Court's error, while not one of constitutional dimension, . . . nevertheless prevented Mr. Benally from 'introducing potentially forceful evidence supporting his contention that his confession was false. . . . He could not explain that false confessions, while counterintuitive, do in fact occur and are more likely to occur in certain circumstances, perhaps in the very circumstances of his case.' . . . This Court should therefore reverse Mr. Benally's conviction and remand this case for a new trial, at which he will be allowed to present that explanation to the jury through the testimony of Dr. Davis.").

that are dispositive of the merits the claims.

The first claim concerns a plea offer for a ten-year sentence, and Petitioner's assertion that

he had no idea the statutory maximum was twenty years.  As recounted in his affidavit,

Petitioner states that he:

> . . .  recall[ed] a meeting when Mr. Finzel told me that if I would say I was guilty
> the government would agree to a sentence of about 10 years.  Mr. Finzel told me I
> should not plead guilty because he was working with an expert who would prove that
> when I signed [the] statement that I fondled Whitney and Nicole I only did so because
> I was tricked by the FBI agents.  Mr. Finzel told me that after the statement was
> invalidated I would be found not guilty if I would agree to let him represent me at trial.
>
> [He recalled] asking Mr. Finzel about the possibility of being convicted at a trial
> and if I were convicted what would happen to me.  I was informed by Mr. Finzel that
> the jury would not convict me but that the sentence for a guilty plea and a sentence
> imposed in the unlikely event of a conviction would be about the same.  If I had known
> that I could receive a sentence of 20-years if I were found guilty I would have agreed
> to plead guilty to avoid even the possibility of being in prison and away from my family
> for 20 years.
>
> * * * * *
>
> . . . If [he] had known that there was even the slightest possibility that I would be
> convicted by a jury and be put in prison for 20 years I would not have agreed to let Mr.
> Finzel represent me at a trial.  I would have agreed to plead guilty for the 10 years
> before the first trial.

*Doc. 9* at 45; *see also id.* at 24-26 (where Petitioner asserts that Mr. Finzel advised him not to

take the plea offer of ten years based on two predictions: (1) "there was a certainty that

Petitioner's statement would not be permitted to be used against him as a result of the anticipated

testimony of Dr. Deborah Davis, an expert in false confessions," and (2) if he was convicted at

trial, the sentence would be "significantly less than the statutory maximum" and "'about the

same' as that offered in the plea agreement").

An attorney's deficient performance in connection with a plea can be the basis for an

ineffectiveness claim, and defendant's assertion that he would have taken a plea but for that

deficient conduct is sufficient to come within the auspices of the *Strickland* prejudice prong.

*See, e.g., Williams v. Jones,* 571 F.3d 1086, 1090 n.3 (10th Cir. 2009) ("a defendant may prevail

on an ineffective assistance claim in this context by demonstrating deficient performance and

prejudice, viz. a defendant is required to show that counsel's performance fell below an

objective level of reasonableness and that, but for counsel's deficient performance, the defendant

would have accepted the plea offer and pled guilty.") (citing, among other cases, *United States v.*

*Carter,* 130 F.3d 1432, 1442 (10th Cir. 1997)), *cert. denied,* 130 S. Ct. 3385 (2010).  In *Williams,*

for example, the

> deficient performance was counsel's advice concerning the plea agreement-advising Mr.
> Williams he would be committing perjury by accepting the plea offer and insisting that
> Mr. Williams proceed to trial or find new counsel if he wanted to accept it.  As the
> OCCA no doubt recognized, the prejudice Mr. Williams identified was that, had he been
> adequately counseled, there is a reasonable probability that he would have accepted the
> plea offer and limited his exposure to ten years. . . .  The fact that Mr. Williams
> subsequently received a fair trial (with a much greater sentence) simply does not vitiate
> the prejudice from the constitutional violation. . . . ***This would be a very different case***
> ***had the assistant district attorney declined to extend an offer or revoked it prior to***
> ***trial. . . . However, the OCCA found that the ineffective assistance occurred when the***
> ***plea offer was available.***  The evidence credited by the OCCA suggests a reasonable
> probability that the plea offer would have been accepted but for defense counsel's
> ineffective assistance.

*Id.* at 1091 (emphasis added).

Here, Mr. Finzel's affidavit mentions nothing about potential maximum sentence or

acquittal prognostications.  The United States does not dispute that it offered a plea that carried a

sentence of ten years, but it is unclear from the record when the plea offer, any negotiations, and

rejection took place and, significantly, whether an offer was made after the first mistrial.  *See*

*Doc. 15* at 13-14; *see, e.g., United States v. Washington,* 619 F.3d 1252 (10th Cir. 2010) ("Mr.

Washington first contends his counsel was constitutionally deficient in failing to advise him

properly regarding the government's plea offer.  Even assuming that defense counsel's

performance was deficient, however, the district court's factual finding that the government

never made a firm plea offer finds adequate support in the record.  Thus, Mr. Washington cannot make the requisite *Strickland* showing that but for Mr. Long's ineffective assistance, he would have pled guilty.").

Nonetheless, under the *Julian* decision cited in *Williams,* to establish prejudice, the attorney's conduct or lack thereof that the defendant is relying upon must be the "***decisive factor*** in the defendant's decision to take a plea or opt for trial." *Julian v. Bartley,* 495 F.3d 487, 498 (7th Cir. 2007) (emphasis added); *Williams,* 571 F.3d at 1091 (citing *Julian*).  Here, it is undisputed that Petitioner knew he would have to admit guilt to benefit from the plea offer.  Yet he testified under oath, not once, but basically three times that he was not guilty of the girls' allegations notwithstanding his confession, because that his statements to the FBI were false.  I think the record is clear that what drove Petitioner's plea decision was the hope of an acquittal, not the potential sentence.  To now give credence to his post-trial assertion that the length of the sentence he could receive (rather than his asserted innocence) was the decisive factor in his decision to turn down a ten-year plea offer would be untenable.  Doing so under these circumstances would allow a criminal defendant to turn trials and appeals into "trial runs" and, if the outcome is not to his liking, then seek to enforce the more favorable terms of a plea he rejected.

In a related claim, Petitioner asserts that Mr. Finzel never explained that the right to testify was Petitioner's alone to make, or that there could be sentencing consequences for his testimony.  Instead, "just before the start of the first trial," Mr. Finzel allegedly informed Petitioner about the *Daubert* ruling and then "told" Petitioner he "would have to testify." *Doc. 9* at 45.  And, because Mr. Finzel "is a lawyer," Petitioner "felt [he] had to do what [Mr. Finzel] told me to do." *Id.*  Thus,

Petitioner's decision to testify was made as a result of the advice given by Mr. Finzel that unless Petitioner took the stand, it was inconceivable that the jury would acquit. Petitioner argues that this advice amounted to coercion, i.e., unless he testified he would be found guilty. Such coercive advice infringed upon Petitioner's ability to make a knowing and intelligent decision whether to testify. Petitioner testified at trial only because he was advised by counsel that it was the only means of securing an acquittal. Counsel failed to inform Petitioner that his testimony could lead to a sentence enhancement and thus, counsel failed to perform as counsel contemplated under the Sixth Amendment. As a result of counsel's deficient performance Petitioner's advisory guideline was increased two-levels. Such an increase is sufficient to meet the prejudice prong of *Strickland. See, Glover* . . .

*Id.* at 31 (citing *Glover v. United States,* 531 U.S. 198, 204 (2001) where it states: "Authority does not suggest that a minimal amount of additional time in prison cannot constitute prejudice. Quite to the contrary, our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance.").

"[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." *Rock v. Arkansas,* 483 U.S. 44, 49 (1987); *see also Jones v. Barnes,* 463 U.S. 745, 751 (1983) ("the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal."). "Therefore, the 'same logic which dictates that a criminal defendant may not be compelled to testify by defense counsel, also supports the conclusion that a defendant may not be compelled to remain silent by his or her attorney.'" *Brown v. Artuz,* 124 F.3d 73, 78 (2nd Cir. 1997) (quoting *Campos v. United States,* 930 F. Supp. 787, 791 (E.D.N.Y. 1996)), *cert. denied,* 522 U.S. 1128 (1998). "Defense counsel should inform the defendant that he has the right to testify and that the decision whether to testify belongs solely to him." *Cannon v. Mullin,* 383 F.3d 1152, 1171 (10th Cir. 2004), *cert. denied,* 544 U.S. 928 (2005).

Taking Petitioner's affidavit as true, the only thing Mr. Finzel affirmatively did was to recommend that Petitioner testify. Making a recommendation does not constitute "deficient"

conduct – though the decision to testify or not belongs to the defendant, "counsel can and should advise him of the implications of this choice."  *Wesley v. Snedeker,* 284 Fed. App'x  521, 526 (10th Cir. 2008), *cert. denied,* 129 S Ct. 939 (2009).  "Counsel should also discuss with the defendant the strategic implications of choosing whether to testify, and should make a recommendation to the defendant."  *Cannon v. Mullin*, 383 F.3d 1152 (10th Cir. 2004); *see also United States v. Teague,* 953 F.2d 1525, 1533-34 (11th Cir.) (cited by *Wesley* and *Cannon*), *cert. denied,* 506 U.S. 842 (1992).  There is nothing inherently deficient in the recommendation itself since the reality is that in cases of child sexual abuse, the testimony of a child victim alone is sufficient to support a conviction.[44]

With good reason, the responsibility for ensuring that the right to testify is understood by a defendant lies with the defense attorney and not the court.[45]  As a result, a habeas petitioner's mere assertion that counsel failed to give the requisite advice will present a claim with a federal

---

[44]  *E.g., United States v. Gabe,* 237 F.3d 954, 961 (8th Cir. 2001) ("Gabe first argues the evidence is insufficient to convict him of Count I, abusive sexual contact of V.G. when she was in the first grade, because there is no evidence corroborating V.G.'s testimony that Gabe abused her.  However, a victim's testimony alone is sufficient to persuade a reasonable jury of the defendant's guilt beyond a reasonable doubt.") (citing *United States v. Wright,* 119 F.3d 630, 633-34 (8th Cir. 1997)); *Picou v. Cain,* 2007 WL 1521021 at *4 (E.D. La. 2007) (trier credited testimony of victim and "[t]estimony of the victim alone is sufficient to prove the elements of the offense . . . even where that victim suffers from mental deficits") (citing *Peters v. Whitley,* 942 F.2d 937, 941-42 (5th Cir. 1991), *cert. denied,* 501 U.S. 113 (1992), which held testimonial evidence of woman with limited communication skills and the mental age of a young child was found to be sufficient to support a rape conviction); *see also, e.g., United States v. Holloworn,* 523 F.3d 882, 890-91 (8th Cir. 2008) (victim's testimony sufficient); *United States v. No Neck,* 472 F.3d 1048, 1052-53 (8th Cir. 2007) (same).

[45]  *E.g., United States v. Pennycooke,* 65 F.3d 9, 11-13 (3rd Cir. 1995) (discussion regarding the concern that court inquiry may sway defendant one way or the other and that direct colloquy by court to ensure right to testify is protected appropriate only in "exceptional, narrowly defined circumstances"); *Harris v. Everett,* 2000 WL 504731 at * 2 -3 (10th Cir. 2000) ("Mr. Harris . . . contends . . . the trial court did not advise him of his right to testify and inquire upon the record if he voluntarily waived that right [but] the state's procedure for ensuring compliance with that right are not of constitutional dimension.") (citing *Brown,* 124 F.3d at 78-79, for the proposition that "no general obligation on trial courts to inform defendant of right to testify and to inquire about waiver").

record that is silent on the topic.[46]  Nevertheless, the *Strickland* inquiry has two prongs, and Petitioner's allegations fail to sustain his showing on the prejudice prong.

The only prejudice Petitioner contends he suffered was a sentencing enhancement directly attributable to the decision to testify.[47]  Without the two-level enhancement, his offense level would have been lowered from 44 to 42.  *See Presentence Report* at 11, ¶ 37.  This reduction, however, would not have affected his Guideline range.  Under the more lenient 2003 Sentencing Guidelines, *see id.* 7, ¶ 26, an offense level of 42 with a criminal history score of I, *see id.* at 23, would have still exceeded the statutory maximum sentence he received, *see id.* at 23 (statutory maximum twenty years; Guideline range of "life"); *see also* U.S. SENTENCING GUIDELINES MANUAL ch. 5 (2003) (table for level 42/I yields Guideline range of "360[months]– life").

Because the two-level enhancement had no adverse sentencing consequences, this claim cannot establish prejudice under *Strickland* and, consequently, is without merit.

---

[46]  *See, e.g., United States v. Dryden,* 1998 WL 930582 at *1 (10th Cir. 1998) ("In *United States v. Hershberger,* 1991 WL 136337 (10th Cir. July 24, 1991) (unpublished), we stated: ' . . . failing to advise the defendant of his right to testify or refusing to call the defendant to testify despite his desire to do so cannot be [appropriate trial stategy].  Therefore, defendant's allegations that defense counsel failed to inform him that he alone controlled the decision to testify and that defense counsel failed to let him testify despite his expressed desire to do so, if proved, would be sufficient to meet the first requirement of the *Strickland* test.'  *Id.* at *3 (internal citations omitted); *see also* . . . *Pennycooke,* 65 F.3d [at] 13 . . . ('[W]e realize that a convicted defendant may assert a claim that the trial attorney gave ineffective assistance under *Strickland* . . . by failing to advise the defendant of his or her right to testify.').");  *c.f. United States v. Janoe,* 720 F.2d 1156, 1161 (10th Cir. 1983) (where defendant did not "argue that the trial court or his attorney deprived him of his right to testify," that "he did not make the decision not to testify, or that he and his attorney disagreed on whether defendant should take the stand . . . that there is no constitutional or statutory mandate that a trial court inquire further into a defendant's decision not to testify in circumstances of this sort"), *cert. denied,* 465 U.S. 1036 (1984).

[47]  The Presentence Report provides that the two-level enhancement is not "to punish a defendant for the exercise of a constitutional right," but does cite Petitioner's trial testimony when giving the enhancement based on Petitioner's statement to the agents.  *Presentence Report* at 9, ¶ 33.

## E.  Counsel's Alleged Trial-Related Ineffectiveness

Petitioner raises several allegations concerning Mr. Finzel's action or inaction during trial. All of them revolve around the same notion – that the evidence, was or should have been rendered, insufficient to support a conviction.  He asserts that the jury instructions concerning the use of force and the number of alleged victims allowed the prosecution to give the jury the impression that Petitioner was a "repeated child molester" and sway them to render a verdict based on emotion.[48]  He also asserts that Mr. Finzel should have challenged how the girls testimony "fluctuated" and "changed," thereby exposing their motive to "concoct" the allegations and allowing him to challenge the sufficiency of the evidence during closing arguments and on appeal.[49]  All of the claims rest on characterizations of the trial record and/or law that are unsupportable.

Petitioner's assertion that the *Zamora* decision required a rewording of the "similar acts"

---

[48]  *See Doc. 9* at 27 ("Petitioner avers that counsel was also ineffective when he failed to object to the ambiguous jury instruction during the second trial regarding the use of alleged force and number of alleged victims."); *id.* at 34-35 (counsel failed to object to language of "Instruction 17 (sic) [18]" on "similar acts" and should have requested the jury be admonished with a limiting instruction that "it could only consider the evidence for the purpose of drawing 'an inference that in doing the acts charged in the indictment, the defendant acted knowingly and intentionally and not because of some mistake, accident, or other innocent reason.[']]") (quoting *United States v. Zamora,* 222 F.3d 756, 763 (10th Cir.), *cert. denied,* 531 U.S. 1043 (2000)); *id.* at 35 (improper closing argument by prosecutor "likely led the jury to a verdict based on passion and emotion").

[49]  *See id.* at 28 ("counsel failed to properly present the significant variations in the pre-trial statements of the alleged victims, their testimony at the first trial, and the subsequent change to both their pretrial statements" but cites only one instance of an inconsistency, Whitney's testimony between the first and second trial "as to the time frame when Petitioner purportedly molested her"); *id.* at 28 ("Counsel's failure to expose the fluctuating testimony . . . impact on counsel's ability to challenge the sufficiency of the evidence"); *id.* at 29 ("'The exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'") (quoting *Jones v. Gibson,* 206 F.3d 946, 956 (10th Cir.), *cert. denied,* 531 U.S. 998 (2000), and citing ABA Standard 4.7-6); *id.* ("An answer to one simple question, 'Why did your story change so often', could have been the lynchpin leading to Petitioner's acquittal."); *id.* at 37 (counsel failed to argue sufficiency of the evidence on appeal).

instruction is misplaced.  The Tenth Circuit's Pattern Criminal Jury Instruction 1.30 reads:

> You have heard evidence of other [crimes] [acts] [wrongs] engaged in by the defendant. You may consider that evidence only as it bears on the defendant's [e.g., motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident] and for no other purpose.  Of course, the fact that the defendant may have previously committed an act similar to the one charged in this case does not mean that the defendant necessarily committed the act charged in this case.

10TH CIRCUIT PATTERN CRIMINAL JURY INSTRUCTIONS (2005 ed.).  Although the United States had requested a similar instruction based on the Fifth Circuit's pattern instructions,[50] Judge Johnson gave the instruction tendered by Mr. Finzel.  Mr. Finzel used the Tenth Circuit pattern instruction 1.30 as authority for the request, but changed the wording of the instruction to read:

> In a criminal case in which the Defendant is accused of an offense of child molestation, evidence of the Defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant, however, evidence of a prior offense – on its own – is not sufficient to prove the Defendant guilty of the crime charged in the indictment.
> Bear in mind, as you consider this evidence, at all times the government has the burden of proving that the Defendant committed each of the elements of the offense charged in the indictment.  I remind you that the Defendant is not on trial for any act, conduct or offense not charged in the indictment.  Of course, evidence that the defendant may have previously committed an act similar to the one charged in this case does not mean that the defendant necessarily committed the act charged in this case.

*United States v. Benally,* CR 05-1854 WJ (Doc. 117 at 22 – Instruction No. 17 given in the second trial); *id.* (Doc. 72 at 19 – Instruction No. 18 given in first trial); *id.* (Doc. 67 at 2 – defense request for instruction, citing Tenth Circuit pattern instruction 1.30 as authority for the request).

---

[50]  *See United States v. Benally,* CR 05-1854 WJ (Doc. 51 at 20; Government's Requested Instruction No. 16, which provided in relevant part:  "'If you find beyond a reasonable doubt from other evidence in this case that the defendant did commit the acts charged in the indictment, then you may consider evidence of similar acts, allegedly committed on other occasions to determine:  whether the defendant had the state of mind or intent necessary to commit the crime charged in the indictment; or whether the defendant had a motive; or whether the defendant had the opportunity to commit the acts charged in the indictment; or whether the defendant acted according to a plan.  These are the limited purposes for which any evidence of other similar acts may be considered").

Failure to tender or give a Tenth Circuit pattern jury instruction verbatim is not erroneous and does not establish counsel's ineffectiveness. Pattern jury instructions are not binding legal authority, are not expected to be given verbatim in all cases, and counsel are expected to tailor tendered instructions to the facts and issues in the case.[51] Furthermore, the instruction given here accomplished the same purpose as pattern instruction 1.30. Simply put, the purpose of the similar acts instruction is to remind the jury that although evidence of similar acts may be admitted for certain reasons, they cannot be used as a basis for conviction. The instruction says just that, only in stronger terms that are more favorable to the defense.[52] Thus, Mr. Finzel's

---

[51] *See, e.g., United States v. De La Torre,* 599 F.3d 1198, 1203 n.1 (10th Cir. 2010) ("The first two elements in the instruction given by the district court deviated from Tenth Circuit Criminal Pattern Jury Instruction 2.85 [and the] district court correctly noted that this portion of the Pattern Instruction incorrectly states the law of this circuit."), *cert. denied,* 2010 WL 2629765 (10/4/10); *United States v. Ramos-Arenas,* 596 F.3d 783, 786 n.1 (10th Cir. 2010) ("Mr. Ramos's proposed jury instruction was essentially the Tenth Circuit Criminal Pattern Jury Instruction, No. 2.40"); *United States v. Ledford,* 443 F.3d 702, 717 (10th Cir. 2005) (noting that "proposed pattern jury instruction is not legal authority," and citing as support *United States v. Burke,* 781 F.2d 1234, 1239 n.2 (7th Cir. 1985) where it states: "Although the pattern instructions are suggestive rather than absolutely binding, a decision of this court is authoritative."), *cert. denied,* 549 U.S. 867 (2006); *id.* (also noting that the resolution to the Tenth Circuit pattern instructions "provides that the inclusion of each instruction 'shall not be construed as adjudicative approval of the content of such instruction, which must await case-by-case review by the Court'"); *Aves By and Through Aves v. Shah,* 997 F.2d 762, 766 (10th Cir. 1993) ("We remind counsel that each instruction, no matter how commonly used, must be carefully reviewed before being recommended to the trial court. Counsel must 'exercise caution when using pattern jury instructions' as 'few pattern instructions are intended to be copied verbatim in every case.' . . . 'Each case has its own peculiar facts and formalized instructions must be tailored to the facts and issues.'") (quoting Hon. Edward J. Devitt, *Ten Practical Suggestions About Federal Jury Instructions,* 38 F.R.D. 75, 77 (1960)).

[52] *See, e.g, Zamora,* 222 F.3d at 762 (Fed.R.Evid. 404(b) "states that '[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.' However, evidence of another crime may be admitted to establish motive, intent, preparation, plan, identity, and absence of mistake or accident."); *id.* (the four-part test of *Huddleston v. United States,* 485 U.S. 681 (1988) determines whether Rule 404(b) evidence is properly admitted and the "more similar" the uncharged crime is "to the charged crime, the more relevant it becomes;); *United States v. Urbano,* 563 F.3d 1150, 1154 (10th Cir.) ("'The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them.'") (quoting *United States v. Villegas,* 554 F.3d 894, 900 (10th Cir.), *cert. denied,* 129 S. Ct. 288 (2009)), *cert. denied,* 130 S. Ct. 434 (2009); 10TH CIRCUIT PATTERN CRIMINAL JURY INSTRUCTIONS cmt. (2005 ed.) (pattern instruction 1.30 "respects the four factors of proper limited purpose, relevance, prejudice analysis, and the right to a limiting instruction mentioned in *Huddleston,*"

decision to tender the instruction was not ineffective, nor was Petitioner prejudiced.

As Petitioner notes, in closing argument the prosecutor stated:

"In a situation where it was crucial to get at the truth, crucial for so many reasons, – Not just his future, but for the future of Nicole, the future of Whitney, the future of the entire family – that this defendant has essentially, well, let's hope not destroyed, but certainly damaged greatly by his selfish actions."

*Doc. 9* at 35 (quoting *Partial Second Trial Transcript 2/15/07* at 20).  From that statement, Petitioner argues that the prosecutor "implied" that "Petitioner was a repeated child molester" and "invited the jury to convict . . . to protect not only the 'future of Nicole,' but that of Whitney as well [and] to protect 'future victims' [by] prevent[ing] Petitioner from future crimes against a child."  *Id.*

It is true that a prosecutor cannot "'incite the passions of the jury by suggesting they can act as the 'community conscience' to society's problems.'"  *United States v. Rogers,* 556 F.3d 1130, 1143 (10th Cir.) (quoting *United States v. Solivan,* 937 F.2d 1146, 1151 (6th Cir. 1991)), *cert. denied,* 129 S. Ct. 2783 (2009); *see also, e.g., United States v. Burnell,* 336 Fed. App'x 775, 778 (10th Cir. 2009) (error for prosecutor to suggest to or exhort jurors to convict based on a "civic duty") (citing to *Wilson v. Sirmons,* 536 F.3d 1064, 1120 (10th Cir. 2008), *en banc review on other grounds,* 577 F.3d 1284 (10th Cir. 2009), *cert. denied,* 130 S. Ct. 3387 (2010) and to *Malicoat v. Mullin,* 426 F.3d 1241, 1256 (10th Cir. 2005), *cert. denied,* 547 U.S. 1181 (2006)).  Even so, a prosecutor also is not required to close an emotionally-charged trial with a dry lecture, and can refer to a defendant in strong terms such as "monster," "lizard," "nine-headed hydra monster," and "predator."  *United States v. Jones,* 468 F.3d 704, 708-09 (10th Cir. 2006)

---

but that "[m]erely reading the text of Federal Rule of Evidence 404(b) is not the best way to instruct the jury.").

(internal quotations and citations omitted).

Here, Petitioner's leap from the actual statement to what he believes it implies requires the exercise of extraordinary interpretive gymnastics. In context, the statement actually refers to a discussion of Petitioner's motive to lie. *See Partial Second Trial Transcript 2/15/07* at 20. Furthermore, nothing in the entirety of the prosecutor's closing argument remotely suggests the sort of fear-based and emotionally-laden argument Petitioner tries to conjure. *See id.* at 16-28. Finally, if the comment were improper, it did not result in a violation of due process. *Jones,* 468 F.3d at 709; *see also, e.g., Darden v. Wainwright,* 477 U.S. 168, 181 (1986); *United States v. Young,* 470 U.S. 1, 9 (1985); *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 645 (1974). Even "'[a]n improper appeal to societal alarm typically does not amount to a denial of due process.'" *Burnell,* 336 Fed. App'x at 778 (quoting *Jones v. Gibson,* 206 F.3d 946, 959 (10th Cir.), *cert. denied,* 531 U.S. 998 (2000).

As for the implication that Mr. Finzel did not rigorously cross-examine the girls,[53] the *Jones* case Petitioner cites is inapposite because it involved a situation where the "trial court improperly curtailed cross-examination." *Jones,* 206 F.3d at 957. Also, challenging Mr. Finzel's cross-examination technique as deficient fails to recognize that "counsel's approach to cross-examination, without more, presents a question of trial strategy." *United States v. Martinez,* 368 Fed. App'x 876, 879 (10th Cir. 2010) (citing *Pickens v. Gibson,* 206 F.3d 988, 1002 (10th Cir. 2000)). Finally, the transcripts reveal that Mr. Finzel's cross-examination of the girls was lengty and thorough and designed to reveal their inconsistencies and bias. And

---

[53] *See Doc. 9* at 28 ("Petitioner does not fault counsel for [not] 'going for the jugular' when cross-examining the alleged victims, counsel had an obligation to Petitioner to expose the changes in their . . ."); *id.* at 29 ("And again, while Petitioner understands counsel's need to cross-examine [the girls] in a manner so as not to appear that he was being overly aggressive . . .").

though he was not bullying, he also did not treat them gingerly, a task that was no doubt distasteful but was in the best interests of his client.  See transcripts cited *supra* note 39.

This case turned on credibility – whether the jurors believed Petitioner's denials or the girls' accusations.  The first mistrial and the juror letter discussed in the next section illustrate that it was a difficult decision.  But that does not mean the evidence was insufficient to convict. The test for sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis original).  A reviewing court cannot reweigh conflicting evidence or assess the credibility of witnesses.  *E.g., Schlup v. Delo,* 513 U.S. 298, 330 (1995); *United States v. Brooks,* 438 F.3d 1231, 1236 (10th Cir. 2006).  If there is conflicting testimony, "it is for the jury to decide which witnesses to believe and which not."  *United States v. Youngpeter,* 986 F.2d 349, 352-53 (10th Cir. 1993).

The claims concerning Mr. Finzel's trial conduct either misstate the record, misstate the applicable law, and/or cannot support a finding of prejudice.  Accordingly, they should be denied.

### E.  New Trial Based On Juror Letter

Petitioner maintains that Mr. Finzel was ineffective for failing to move for a new trial after a juror from the second trial wrote Judge Johnson a letter expressing her "remorse [at] having voted to convict Petitioner."  *Doc. 9* at 27.  Mr. Finzel attached the letter to his sentencing memorandum, *see id.* at 33, explaining that he was foreclosed from using it as a basis for a new trial under Criminal Rule 33 because he had not received it within seven days of the verdict, *see*

*United States v. Benally,* CR 05-1854 WJ (Doc. 131 at 4). He also concluded that legal

precedent precluded using the letter as "newly discovered evidence" in support of a new trial.

> Since the time upon which counsel was informed of the juror's letter was beyond the seven days, the only legal issue would be newly discovered evidence. In reviewing the law in this matter, counsel has concluded, maybe erroneously, that there is no appropriate argument to be made for overturning the jury verdict. In Federal Procedures § 80.16, there is a list of prohibited inquiries in order to challenge a juror's verdict. "Federal Rule of Evidence 606b expressly prohibits consideration of three different kinds of evidence of jury deliberations. 1) Any matter occurring or statement made during deliberation, 2) the effect of anything upon the mind or emotions of any juror and 3) the mental process of the juror whose testimony, affidavit or statement is offered. However, such evidence may be offered to prove whether extraneous prejudicial information or any outside influence was improperly brought to bear upon any juror." Focusing on the latter, ***counsel is unable at this time to argue that any extraneous prejudicial information was brought to bear*** upon this juror to get her to vote against her true feelings and conscience. Furthermore, ***there is nothing in her letter to indicate that any outside influence was improperly brought to bear upon her*** in reaching a decision contrary to her true feelings.

*Id.* (emphasis added). As such, he requested that Judge Johnson consider it in making his

sentencing decision and "to impose a sentence that is lower than either the guideline or the

statutory maximum." *Id.* at 5.

"A new trial based on juror misconduct is appropriate only where there is either a showing

of actual bias or circumstances compel an imputation of inherent bias to the juror as a matter of

law." *United States v. Easter,* 981 F.2d 1549, 1553 (10th Cir. 1992) (internal quotations to

*United States v. Bradshaw,* 787 F.2d 1385, 1390 (10th Cir. 1986) and *Williams v. United States,*

418 F.2d 372, 377 (10th Cir. 1969) omitted), *cert. denied,* 508 U.S. 953 (1993). Whether such

bias is established requires considering the "content of the allegations, including the seriousness

and likelihood of the alleged bias, and the credibility of the source." *United States v. Jones,* 707

F.2d 1169, 1173 (10th Cir.), *cert. denied,* 464 U.S. 859 (1983). Ultimately, the decision concerns

whether Petitioner received a fair trial:

> Something more than an unverified conjecture is necessary to justify the grant of a new trial where only potentially suspicious circumstances are shown. . . .  And even where juror bias is shown, not every incident requires a new trial.  The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial.

*Id.* (internal citations and quotations omitted); *see also, e.g., United States v. McHorse,* 179 F.3d 889, 904 (10th Cir.) (the "Constitution guarantees a defendant a fair trial, not a perfect one.") (citing *United States v. Mitcheltree,* 940 F.2d 1329, 1334 (10th Cir. 1991)), *cert. denied,* 528 U.S. 944 (1999); *United States v. Foghorn,* 2006 WL 4017477 at *31 (D.N.M. 2006).

Here, Petitioner argues that the juror's letter raises an "inference" of "impermissible coercion." *Doc 9* at 32-33.  In the context of the entire letter, however, there is no such suggestion whatsoever.  Instead, the letter reveals how the jurors grappled with the evidence and their consciences in arriving at a verdict.[54]  The reservations expressed by the juror do not even

---

[54] The letter does not identify the juror as male or female, but Mr. Finzel's description refers to the juror as a female, and I will do the same here.  The letter indicated that she had been having "a very difficult and emotional time" since the verdict and a retired friend of hers suggested she write Judge Johnson.  *United States v. Benally,* CR 05-1854 WJ (Doc. 131-1 at 2).  She described how the entire jury "had a somewhat difficult time the first day in deciding which way we should vote" and that by the end of the next day "[m]ost votes were undecided."  *Id.*  The jurors were "thinking that the next day after a good night's rest it might be more clear which way we should vote, and why."  *Id.*  That was not the case for her and one other juror, however, and unlike the others, they were inclined to vote not guilty.  *Id.*  She "felt that the Prosecution had not sufficiently proven their case, and . . . felt very strongly that there was something we were missing . . . a 'gut feeling' that there was something wrong, but neither of us could put a finger on what it was."  *Id.*  They "continually went over the evidence" and "over the instructions," but could not come to a conclusion.  *Id.*  By lunch time on the second day, she was "thinking there was really not sufficient reason for me to go that alone . . . voted guilty, but with reservations," and specifically said that to the other jurors.  *Id.*  Within minutes, she changed the vote back to "not guilty as did another juror.  *Id.* The jury therefore "discussed over and over again the evidence and the instructions," leaving her "extremely emotional" at not being able to come to a decision.  *Id.*  Ultimately, she "was convinced by others that [she] did not have enough reason other than this 'gut feeling' to stick with it," so she "finally decided, based on available evidence, and on the instructions, not to continue to hold out."  *Id.* The other juror "reluctantly agreed, and we finally change[d] our vote.  *Id.*  After the verdict, she was still having the "gut feeling" that "there was not enough information, or that something was missing" and still could not explain why the feeling persisted, *id.* at 2, but realized "that at this point nothing can be done, and possible should not be," *id.* at 3.  The juror closed by saying that with "more information" she "might not have had the difficulty . . . in coming to a decision, in either direction [and that Petitioner] may well have been guilty, or in fact the girls themselves may have been making up the

raise a "thin allegation[] of juror misconduct" sufficient to warrant further inquiry, much less a new trial:

> Another juror, sometime after she had been discharged from jury service, wrote a letter to counsel for Waderich, commending him for his excellent job of defending Waderich. She stated that she had "mixed emotions" about the matter, that she did not base her verdict on the testimony of former employees of Cattle King, and hoped that Waderich would not "serve time." In our view, the letter is rather innocuous and certainly insufficient to require the trial court to make inquiry of the juror. Jurors may, at times, feel sorry for a defendant even though they voted to convict the defendant of the crime charged. The fact of the former, however, does not in any wise vitiate the latter.

*United States v. Cattle King Packing Co., Inc.,* 793 F.2d 232, 243 (10th Cir. 1986), *cert. denied sub nom.,* 479 U.S. 985 (1986); *see also e.g., Jackson v. Potter,* 587 F. Supp. 2d 1179, 1184-85 (D. Colo. 2008) (jury foreman letter was "far too thin a reed on which to order an evidentiary hearing, much less to premise a finding of juror misconduct or bias."). Accordingly, this claim lacks merit as Petitioner can neither establish deficient conduct or prejudice under *Strickland.*

## F.  Sentencing Guidelines

Under the 2003 Sentencing Table, an offense level of 27 with a criminal history category I yields a Guideline range of "70–87" months. Petitioner claims that Mr. Finzel failed to challenge the five "sentencing enhancements" that resulted in a seventeen-level increase to the base level of 27. The five enhancements he cites are: a four-level increase for use of force under paragraph 28; a four-level increase for Whitney's age under paragraph 29; a two-level increase for Whitney being under his "custody, care, or supervisory control" under paragraph 30;

---

story for some reason, which the defense tried to show." *Id.* She just felt very strongly that [she] personally did not have enough information, but I also believed that I did not have enough to show anyone why I felt that way." *Id.* She also found that "[w]riting this letter has been somewhat therapeutic, and maybe this is all that was needed," and "in spite of the difficult time [was] thankful for the opportunity to serve." *Id.*

the two-level increase for obstruction of justice under paragraph 33, previously discussed; the five-level increase for being a "repeat" offender due to his conduct with Nicole under paragraph 35. *Doc. 9* at 36. The only enhancements specifically discussed are the use of force and age enhancements under paragraphs 28 and 29, which Petitioner claims "constitutes double counting." *Id.*

This claim is without merit for several reasons. First, the increases Petitioner fails to discuss are "conclusory" and "[c]onclusory allegations that counsel was ineffective are not sufficient to warrant habeas relief." *Weedman v. Hartley,* 2010 WL 3860716 at *3 (10th Cir. 2010) (citing *Humphreys v. Gibson,* 261 F.3d 1016, 1022 n.2 (10th Cir. 2001)). Second, among other challenges, Mr. Finzel did in fact challenge paragraphs 28, 30, and 35. *See United States v. Benally,* CR 05-1854 WJ (Doc. 131 at 16-18). Third, "[d]ouble-counting occurs when the same conduct on the part of the defendant is used to support separate increases under separate [sentence] enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes.'" *United States v. Terrell,* 608 F.3d 679, 683 (10th Cir. 2010) (quoting *United States v. Rojas,* 531 F.3d 1203, 1207 (10th Cir. 2008)). "Otherwise, '[t]he court may punish the same act if the enhancements bear on conceptually separate notions relating to sentencing.'" *United States v. Redmond,* 2010 WL 2881515 at *5 (10th Cir. 2010) (quoting *Rojas,* 531 F.3d at 1207). That it would be easier for a grown man to hold down a young girl is a spurious basis to find the two enhancements constitute "double counting." Using force to hold down Whitney's arms and legs and her tender age are two completely distinct characteristics.

Thus, I cannot find that Mr. Finzel's conduct was "deficient" under *Strickland* concerning paragraphs 28, 29, 30, or 35. That leaves only the obstruction enhancement under paragraph 33 which obviously cannot support a finding of prejudice. *See supra,* Section III.D.

## *G.  Conclusion*

None of Petitioner's claims, either singly or in combination, afford any basis for habeas relief.

Wherefore,

**IT IS HEREBY RECOMMENDED** that the § 2255 petition be dismissed with prejudice.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---

_____
UNITED STATES MAGISTRATE JUDGE